## Max I. CHASTAIN

v.

### Clarence M. KELLEY, Director, Federal Bureau of Investigation, Appellant.

#### No. 73–2137.

United States Court of Appeals, District of Columbia Circuit.

April 2, 1975.

---

Appeal from the United States District Court for the District of Columbia (D.C. Civil Action 570–73).

Barbara L. Herwig, Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, were on the brief, for appellant. Harold H. Titus, Jr., U. S. Atty. at the time the record was filed, John A. Terry and Robert M. Werdig, Jr., Asst. U. S. Attys., also entered appearances for appellant.

Lawrence Speiser, Washington, D. C., for appellee.

Before FAHY, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

The District Court ordered the Federal Bureau of Investigation to expunge all records of an incident giving rise to charges by it that one of its agents had, among other things, misused his credentials. After first suspending the agent and giving him notice of proposed dismissal, the Bureau subsequently decided not to take this action. It was two days late in filing an opposition to the motion to expunge, which had been promptly filed after the Bureau's decision and as promptly granted. We think that there are interests at stake going beyond those of the immediate parties to this litigation, and which warrant our vacating the judgment entered by the District Court in order that the Government may be heard on the question of expungement.

I

Plaintiff-appellee became a Special Agent of the FBI in November of 1970. On March 8, 1973, he received a letter from L. Patrick Gray, III, then the Bureau's Acting Director, informing him of his immediate suspension without pay and of his proposed dismissal as of thirty days from the letter's receipt. The letter set out a number of grounds for

these actions. They all arose from the circumstances we now summarize.

On January 29, 1973, appellee was on leave from his duties in the Bureau's Washington Field Office, and was spending several days in Virginia Beach, Virginia. His purpose, at least in part, was to visit a female friend who was married to a naval officer then absent on assignment. Plaintiff had grown intimate with the woman during his own earlier naval service. She informed him upon arrival that another woman, a mutual acquaintance and also a resident of Virginia Beach, had recently complained of receiving a number of obscene telephone calls. Appellee came to the complainant's aid. He went to the home of the neighbor whom she suspected was responsible for the calls. Gaining entrance, he displayed his FBI credentials and asked the neighbor a number of probing questions aimed at discovering whether he was indeed the culprit. The neighbor's mother, who was present at the time, later reported the incident to the local FBI office in Norfolk, Virginia. After the interview, appellee reported back to the recipient of the telephone calls his conclusion that her suspicions about the neighbor were correct. He also divulged the neighbor's true name, which he had discovered during the interview.

For this conduct, which appellee recounts in somewhat more innocuous terms but does not really deny,[1] the Acting Director charged him with misuse of his FBI credentials, unauthorized disclosure (to the complainant about the telephone calls) of investigative information gained through his official position, and failure to inform the Special Agent in charge of the Norfolk office of an investigation within that agent's territory. Appellee was further accused of not having kept his Washington superiors sufficiently informed of his whereabouts (he had left only the post office box number

---

1. Appellee submitted for *in camera* inspection by the District Court an affidavit in which, *inter alia,* he admitted the investigative visit to the house of the suspect neighbor, but maintained that during it he had been courte-

ous, had displayed his credentials only to put the neighbor at ease, and had specified that his was not an official FBI investigation. App. II at 8–25.

of his female friend) and also of "deception, lack of integrity, [and] uncooperative attitude." The Acting Director gave as an example of the latter the fact that, in the course of applying to become a Special Agent, appellee had responded negatively to the question of whether he had any moral deficiencies, and had not reported the relationship he had had with the female friend during his earlier naval days.

On March 26, 1973, before final action was taken by the Bureau pursuant to its March 8 letter, appellee sued in the District Court for an order prohibiting his dismissal and restoring him to active duty. A temporary restraining order was entered against dismissal only. While appellee's motion for a preliminary injunction was still pending, William Ruckelshaus replaced Gray as the Bureau's Acting Director. Ruckelshaus cancelled the suspension and proposed dismissal, and also awarded plaintiff his back pay. On May 23 the Government moved that the case be dismissed as moot. Appellee moved the following day for an order requiring the FBI (1) to expunge all records relating to the suspension and proposed dismissal, (2) never to base any further personnel action on those matters, and (3) to inform all those agencies to which the FBI had disseminated information about them that the charges had been withdrawn. On June 6 the District Court dismissed the case as moot, and, no opposition having been filed by the Government, granted the motion for expungement.[2]

## II

The federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute. See, e. g., Menard v. Saxbe, 162 U.S.App.D.C. 284, 498 F.2d 1017, 1023 (1974); Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, 966 (1973); Menard v. Mitchell, 139 U.S.App. D.C. 113, 430 F.2d 486 (1970). The cited cases involved the retention and dissemination of criminal records, and it is in that context that the propriety of expungement orders has been most thoroughly explored. Since the power to order expungement is, however, only an instance of the general power of the federal courts to fashion appropriate remedies to protect important legal rights,[3] it may also be invoked when the Government records in question are administrative rather than criminal.

The precedents in this latter regard are few, but they are clear enough. In Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955), for example, the Supreme Court held that the Loyalty Review Board, an organ of the Civil Service Commission established to review the recommendations of federal agencies that employees be dismissed for disloyalty to the United States, exceeded its ju-

**2.** The order in its entirety required:

1. That defendant and his successors shall remove from plaintiff's personnel file and from all records of the Federal Bureau of Investigation any and all records, memoranda, documents, writings, statements of witnesses, and investigative records, describing, referring to or alluding to the facts upon which the suspension and the proposed termination of plaintiff were based; and

2. That defendant and/or his successor or successors are permanently enjoined from using any of the information or records referred to in Paragraph 1 of this Order or any records relating to this suit as criteria for advancement, promotion, salary increase or any other professional award or for any disciplinary action or termination of employment; and

3. That defendant and/or his successor or successors shall contact any and all agencies, including the United States Civil Service Commission, to which they have disseminated any information regarding plaintiff and the facts upon which plaintiff's suspension and proposed termination or this suit were based and inform each such agency that the Bureau had withdrawn the suspension and proposed termination and that this Court has requested each such agency to remove any and all references of the above from any of its records; . . . App. I at 49–50.

**3.** See Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 396, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. McLeod, 385 F.2d 734, 748–750 (5th Cir. 1967).

risdiction in reopening the case of an employee whose loyalty had been approved by the relevant agency. The relief to which the Court found the employee entitled included "an order directing the respondent members of the Civil Service Commission to expunge from its records the Loyalty Review Board's finding that there is a reasonable doubt as to petitioner's loyalty . . .." *Id.* at 348–349, 75 S.Ct. at 799.[4]

Expungement, no less than any other equitable remedy, is one over which the trial judge exercises considerable discretion. It is a versatile tool: expungement of only some records, from some Government files, may be enough, as may the placing of restrictions on how the information contained in the records may be used. It is a tool which must be applied with close attention to the peculiar facts of each case. Only in that way can it effect a proper reconciliation of the competing interests of the Government in retaining information relevant to job performance, and of the individual in having it forgotten. But it must be rationally and selectively responsive to those interests.

Appellee's interest is in the vindication of the rights alleged in his complaint, that is to say, in not being (i) suspended without pay during the thirty-day notice period in violation of the Veteran's Preference Act, (ii) suspended or dismissed without such hearing as due process requires, (iii) penalized by one who was serving illegally as the Bureau's Acting Director; or (iv) dismissed for improper or unsubstantiated reasons.[5] These rights, assuming they exist, were in large part vindicated when appellee was reinstated with back pay.

There may remain a right not to be adversely affected by the information in the future. Such a right may exist if the information (1) is inaccurate, (2) was acquired by fatally flawed procedures, or (3) as may be the case with information about his private and personal relationships, is prejudicial without serving any proper purpose of the Bureau's. But there has not as yet been a finding by the trial court that any of these conditions exist. In fact, appellee has made no objection to the manner in which the Bureau carried out its inquiry, and he has admitted the substantial truth of what it found with respect to the misuse of his credentials. Moreover, the Bureau would appear to have a strong interest in retaining at least some of the information that the District Court ordered expunged. The abuse of official power by appellee in this case may seem a mild

**4.** *Accord,* Service v. Dulles, 98 U.S.App.D.C. 268, 235 F.2d 215, 219 (1956) rev'd on other grounds, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). *See also* Smith v. District Unemployment Compensation Board, 140 U.S.App.D.C. 361, 435 F.2d 433, 439 (1970) (Federal agency's finding that ex-employee had resigned without cause, which finding made her ineligible for unemployment compensation, stricken unless required hearing provided). *Cf.* Finley v. Hampton, 154 U.S. App.D.C. 50, 473 F.2d 180 (1972) (presence in files of federal agency that employee had friends with "homosexual mannerisms" did not constitute cognizable legal injury); Newell v. Ignatius, 132 U.S.App.D.C. 252, 407 F.2d 715 (1969) (suit by naval disenrollee to expunge records of alleged disloyalty mooted by Navy's voluntary expungement).

In Janca v. Gray, Civil No. 1351–71 (D.D.C., filed April 2, 1973), two ex-employees of the FBI alleged that they had been illegally discharged because of their off-hours work for an organization which opposed certain foreign American military involvements. Following a default judgment, the Bureau was ordered, in terms similar to those of the order herein appealed from, to expunge all records of the incident, to base no future personnel action thereon, and to bring the court's order to the attention of all other agencies to which information concerning the incident had been disseminated. An appeal was taken but subsequently abandoned by the Government.

Were it necessary to protect important statutory or constitutional rights of appellee, expungement in this case would not be prevented, as the Government has argued, by the command of 44 U.S.C. § 3314 (1970) that Government records "may not be alienated or destroyed except under this chapter." Since it clearly effects no repeal of other provisions, this general statutory command must be reconciled with other statutory requirements, and must bow to them when they are more specific, as of course it must bow to the Constitution.

**5.** App. I at 4–10.

one, but even mild abuses, should they be tolerated and allowed to proliferate, will pose a severe threat to the public confidence upon which the Bureau relies.

■ The order may well have been justified at the time it was originally entered. The new Acting Director's abandonment of the proposed disciplinary action could, in one view of the matter, be taken as implying an admission by him that the charges against appellee were inaccurate, improperly made, or simply insignificant. Such an admission might well have justified expungement, and might be presumed to have been made when the time in which to oppose expungement expired without the new Acting Director's raising any objection. The reasonableness of that presumption was destroyed, however, when the Government filed its subsequent opposition, which included the following statements:

> By the cancellation of the proposed dismissal and suspension, plaintiff was not absolved of any wrongdoing. The fact remains plaintiff did misuse his credentials and did unnecessarily involve the FBI in a matter over which it had no jurisdiction.

App. I at 52.

We do not know the precise reason for the cancellation. The new Acting Director may have considered only some of the charges against plaintiff to be credible and proper. Or—and what seems more likely—he may have thought the admitted misconduct insufficient, at least as a first offense, to warrant the severe sanction of dismissal. In any event, his opposition, albeit belated, raised doubts as to the propriety of expungement, and strongly suggested the desirability of a hearing on its merits.

The expungement order must therefore be vacated, and is not to reissue prior to a hearing on the extent to which the information in the Bureau's files violates appellee's rights without serving any legitimate needs of the Bureau. In this connection we note the considerable latitude given the Bureau in its internal affairs, cf. Carter v. United States, 132 U.S.App.D.C. 303, 407 F.2d 1238, 1242 (1968), and also the limited relevance of the cases involving expungement of criminal records, the potential prejudicial effects of which far exceed that of the information here at issue. Compare Menard v. Saxbe, supra, 498 F.2d at 1024 (adverse effects of criminal records enumerated), with Finley v. Hampton, 154 U.S.App.D.C. 50, 473 F.2d 180 (1972) (effect of certain adverse information in employing agency's files found not legally cognizable).

■ The part of the challenged order to which we see least objection is that requiring the Bureau to inform other agencies to which it has hitherto disseminated information about this matter that appellee was not in fact disciplined for it. Certainly it is the Bureau's obligation to correct any erroneous information. Since the action the Board is required to take with respect to other agencies will otherwise depend on what it itself is required to do, however, it seems best to vacate the entire order and to allow the District Court to reexamine—and perhaps to refashion—it in the light of what may be revealed by further proceedings.

### III

The Government has not made it easy for the courts to protect its interest in this case. The challenged order was filed without opposition on June 6. On June 18 the Government moved for reconsideration under Fed.R.Civ.P. 60, but failed to allege any of the grounds upon which reconsideration may be granted thereunder. Instead, it asserted only that the order was "contrary to 44 U.S.C. § 3301 et seq., and the prevailing case law in this jurisdiction." App. I 55. A supporting memorandum incorporated by reference the Government's earlier untimely opposition to expungement, adding a case citation and quotations from 44 U.S.C. § 3301 et seq.[6] Thus, the Government in its reconsideration mo-

---

6. See note 4 supra (last paragraph).

tion attacked the district judge's order on its merits, apparently assuming that Rule 60 gave it its first opportunity to appeal, which of course it does not. Gilmore v. Hinman, 89 U.S.App.D.C. 165, 191 F.2d 652, 653 (1951).

Perhaps the Government intended, as it now argues it did, to move under Rule 59(e) to alter or amend judgment. Actually the more appropriate motion was indeed under Rule 60.[7] Expungement was ordered, we must assume for present purposes, because it was unopposed; and what the Government needed was to be relieved of this default. Rule 60 allows reconsideration of such a "default judgment" where the failure to oppose is due to "excusable neglect." *See* 7 Moore, Federal Practice 248–251 (1974), and cases cited. As it happened, the Government offered no excuse whatsoever; and, under the circumstances, the district judge's refusal to reconsider was certainly understandable.

■ It was not, however, required. Reliance on the wrong Rule may be overlooked, as neglect may be excused, in the discretion of the trial judge,[8] and we do not think that that discretion was exercised to the best purpose in this instance. The Government's errors, whether excusable or not, certainly worked no great inconvenience on the court, the opposition to expungement being out of time by only two days. More important, reconsideration was sought of an order on which there had never been a hearing on the merits, and which had the effect of removing from appellee's personnel file all reference to what appears to have been a serious want of

sound judgment on his part in the exercise of his official authority.

The latter factor is most persuasive for us. The expungement order on its face appears to flow as a natural consequence from the Bureau's having abandoned its purpose to punish appellee by dismissal. It would indeed be unfortunate if in the future the Bureau were to think that, once it had proposed the suspension and dismissal of an employee, its only choices were to carry out that particular threat or to have all trace of the matter expunged from its records.

To be sure, we could limit the precedential effect of the district judge's decision in this case by upholding it solely on the basis of the Government's procedural oversights. But appellee was by his own admission guilty of "questionable judgment." Should that lapse on his part be wiped from the Bureau's records, it may be at the expense of other agents whose records better qualify them for promotion or other preferment. They should not suffer for the Government's procedural errors, any more than should the public who bear the brunt of such lapses and who are entitled to have the Bureau's personnel administration take them into account.

The judgment appealed from is vacated and the case remanded with instructions to allow the Government an opportunity to be heard in opposition to the motion for expungement in further proceedings consistent with this opinion.

It is so ordered.

TAMM, Circuit Judge, did not participate in the disposition of this case.

---

7. It is not as clear as the Government seems to have assumed that a movant under Rule 59(e) may seek to "alter or amend" a judgment simply because it was erroneous. *Cf.* Erickson Tool Co. v. Balas Collet Co., 277 F.Supp.. 226, 234 (N.D.Ohio 1967) (not the purpose of Rule 59(e) to allow movant to

seek "complete reversal of the Court's judgment"), aff'd 404 F.2d 35 (6th Cir. 1968).

8. *See* Hutches v. Renfroe, 200 F.2d 337, 341 (5th Cir. 1952); Randolph v. Randolph, 91 U.S.App.D.C. 170, 198 F.2d 956 (1952); 7 Moore Federal Practice 251 (1974).