**Joseph F. DUAL, Sr., Plaintiff,**

v.

**Robert E. GRIFFIN, Defendant.**

**Civ. A. No. 76–1385.**

United States District Court,
District of Columbia.

July 28, 1977.

On Motion to Amend Judgment Nov.
18, 1977.

Roger C. Spaeder, Washington, D. C., for plaintiff.

William E. Hill, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e, *et seq.* Plaintiff Joseph F. Dual, Sr., is a black male, fifty-nine years of age, who is employed by the defendant General Services Administration ("GSA") in Region 3 of its Public Buildings Service ("PBS"), as a Buildings Management Specialist. His complaint of racial discrimination charges the defendant agency with wrongfully denying him a promotion to the position of Supervisory Labor Management Relations Specialist in 1975 and with undertaking certain extreme measures of discriminatory retaliation against him after he subsequently filed an employment discrimination complaint in connection with that promotion denial. Upon the Court's full consideration of the evidence adduced at trial, and for the reasons briefly set forth below, the Court finds that plaintiff has failed to prove that his non-selection for the supervisory position in question was discriminatory, but that he has amply proven discriminatory retaliation

by the agency and is therefore entitled to full relief appropriate to that latter claim.

## FACTUAL BACKGROUND

The evidence presented in this case is clear and for the most part undisputed. Plaintiff has been employed by GSA since 1962,[1] when he was hired as a carpenter. In 1969, he accepted an opportunity offered by PBS's Chief of Buildings Operation to enter a position in which he would render personal and vocational counseling services to GSA employees.[2] From 1969 through 1975, under the position title of "Buildings Management Specialist,"[3] plaintiff performed in this field with a measure of diligence and ability which, according to every available indication, was nothing short of exemplary. During the course of that period he received three promotions, advancing from the GS–7 level to that of GS–12. He also received numerous awards and commendations in recognition of his excellent service, including three special achievement cash awards and six perfect attendance awards covering the years 1967–1973.[4]

1. Plaintiff testified that during the mid-1960's there was a break in his service of approximately 27 months due to his sudden affliction with a serious cardiovascular condition (acute angina). He returned to work fully certified by a major hospital that his condition had been brought under control. *See* Plaintiff's Exhibits # 15 and 15a.

2. Plaintiff testified that this opportunity was extended to him by John J. Province, then Chief of Buildings Operation, later to become Acting Regional Director of PBS. *See* Plaintiff's Exhibit # 56. Plaintiff further stated that Province wanted him to become one of the first blacks to enter the counseling field at PBS. *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 20.

   Almost all of plaintiff's work during the early years of his counseling career could best be described as "personal counseling" of GSA employees concerning any difficulties which might interfere with their job performance. Plaintiff testified that such difficulties would often involve the family members of employees, such that his counseling services would touch upon a full range of counseling areas, including alcoholism, drug abuse, and juvenile delinquency, as well as the more general family and financial problems of GSA's employees. *See* note 4 infra.

3. Although the defendant agency's witnesses did not clarify this point at trial, it appears that GSA made the determination at the time or prior to plaintiff's promotion in 1969 that certain counseling services could best be rendered by those employees who occupied the general job title of "Buildings Management Specialist." Although the evidence reflects that after he left his carpenter's job in 1969 plaintiff performed counseling services exclusively, *see* note 4 infra, his formal job description did not even refer to those duties until the time of his promotion in 1972 to the GS–12 level in recognition of his new EEO counseling functions. *See generally* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 3A. Even at that, in 1972 plaintiff's job description was altered only to briefly remark that: "He also serves as a *part-time* Equal Employment Opportunity Counselor for Public Buildings Services employees." *Id.* at 2 (emphasis added).

   Plaintiff testified that he pointed out to his superiors at the time of each promotion the obvious disjunction between his actual full-time counseling duties and his job description and would also question the logic of his position classification as a "Buildings Management Specialist." His unrebutted testimony was that he was told on each such occasion, most recently in 1972 by PBS's Acting Regional Director Province, that he should not disrupt the status quo and that his promotion potential was greater in his current job title.

4. Plaintiff's fine achievements and his agency's proud recognition of them are fully documented and part of the record. *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tabs 3C and 3D. *See generally* Plaintiff's Exhibits # 19 and # 34. For example, an "Outstanding Performance Appraisal" of plaintiff after the first evaluation of his counseling career spoke of his work as follows:

   During the rating period which ended February 28, 1970, Mr. Joseph F. Dual was assigned as a Buildings Management Specialist, GS–07, in the Buildings Services Branch. In addition, he was designated as part-time Equal Employment Opportunity Counselor for Buildings Operation Division employees on August 7, 1969. *However, because of the large number of employees in the Division, he has had to devote full time to employee counseling.* It should be noted that although he is assigned as an EEO Counselor, he is actually called upon to investigate grievances and appeals and to counsel employees on matters not directly related to the EEO program.
   Although as a counselor he operates under the direction of the Program Coordinator, Buildings Operation Division, he has demonstrated the ability to work with a minimum amount of direct supervision. He uses his

Moreover, plaintiff's performance ratings during those years reveal that his work was repeatedly evaluated as "exceptional," "outstanding," and "superior" by his supervisors.[5]

In 1972, plaintiff's duties were further expanded as part of efforts initiated by GSA to make formal equal employment opportunity counseling available to its employees. A memorandum distributed throughout the Public Buildings Service at that time announced GSA's new Equal Employment Opportunity Program and declared as follows: "Mr. Joseph Dual is our Equal Employment Opportunity Counselor for PBS and is available for personal consultation regarding EEO, or any personal and financial problems you may be encountering."[6] Thereafter, plaintiff devoted a substantial portion of his time to EEO counseling, often meeting with GSA employees on his own time when the workload so demanded.[7]

The events giving rise to this action originated in 1974, with the first of three recent structural reorganizations of the Public Buildings Service. At that time, a Management Operations division was established within PBS, containing five newly-created staff elements.[8] Under this new structure, the counseling functions performed by plaintiff and his co-workers were placed in a staff element known as "Unions and EEO Administration." One of plaintiff's co-workers, one Jerry Kaplan, was selected to be temporary supervisor of this staff and in early 1974 was detailed to that position.[9]

---

own initiative in pursuing his investigation of complaints and grievances, but he also exercises good judgment in knowing when to consult with top management.

Mr. Dual has handled complaints and grievances presented by all categories of employees—supervisory and nonsupervisory, skilled and unskilled, wageboard and GS grades and in all occupations. As indicated before, these complaints and grievances were not limited to the EEO program. *The counseling he was required to give covered a wide range of situations which included working conditions, promotion procedures, disciplinary actions, supervisory-employee relations, and not infrequently, personal problems such as marital and financial difficulties.*

In attempting to resolve these problems, Mr. Dual has dealt effectively with all levels of management and supervision. He has displayed exceptional initiative and resourcefulness in knowing to which of the many organizational units within GSA he must go to get assistance in working out solutions. Further, he has worked with other Government organizations and private concerns to effect solutions to personnel problems. He works well with people at all economic levels and generally resolves grievances on an informal basis.

He is particularly conscious of the necessity to follow up on the cases he has handled to assure that the problem has actually been resolved and to prevent its recurrence. *He has frequently rescheduled his hours on a voluntary basis to visit employees on the work site when they are working on other than normal shifts. In addition, it is not unusual for him to contact people at home during evenings and weekends as part of his counseling procedures. The positive effects of these actions are impossible to measure.*

But there is no doubt that it is a boost to an employee's morale to know that management is that concerned about his welfare.

That Mr. Dual has performed above the Grade GS–07 level is beyond question. He has consistently put the interest of GSA and its employees above his own interests and is deserving of this outstanding rating.

Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 3C, pp. 1–2 (emphasis added).

5. *See* Plaintiff's Exhibit # 23.

6. *See* Plaintiff's Exhibit # 56. It was not long after the issuance of this memorandum that plaintiff received his promotion to grade 12. *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 3, p. 4.

7. *See, e.g.,* note 4 *supra.* Plaintiff testified that approximately 90 percent of his counseling efforts after 1972 were in the EEO area, with the remaining 10 percent of his time devoted to more general personal counseling matters. One of his supervisors, James E. Zaiser, characterized plaintiff's work as "human relations" counseling.

8. These five new staff elements were entitled as follows: (1) Manpower Management Branch; (2) Financial Management Branch; (3) Support Management Branch; (4) Unions and EEO Administration; and (5) PBS Information System. *See* Plaintiff's Exhibit # 17. *See also* Defendant's Exhibits # E and # H.

9. In May of 1974, Kaplan was officially designated as the "Acting Special Assistant" in charge of this new staff element. Plaintiff's Exhibit # 17. According to Robert R. Kane, the GSA official who selected Kaplan to perma-

More than a year later, in August of 1975, this supervisory position was the subject of a formal vacancy announcement. The only two candidates to compete for this position, plaintiff and Kaplan, were evaluated by a screening panel, found "qualified" and "highly qualified" respectively,[10] and were referred to Acting Director of the Management Operations Division Robert R. Kane, the designated selecting official. In October, 1975, Kaplan was selected for permanent assignment to this position.[11]

After the selection was announced, plaintiff instituted an EEO action which ultimately led to his filing a formal complaint of race discrimination on January 14, 1976.[12] At approximately this same time, plaintiff was advised by Kaplan and Kane that his counseling duties could not "justify" a GS-12 position and that he would have to accept downgrade to a GS-11 counseling position or else a lateral transfer to a Buildings Management Specialist position which involved no counseling.[13] Plaintiff expressed interest in neither alternative, but was never even given the opportunity to choose

between them. On June 1, 1976, after plaintiff returned to work from an emergency hospitalization, he was ordered to report to the Custodial Management Section of GSA's Buildings Services Branch where he was assigned to a custodial staffing position.[14] This new job, which plaintiff has performed since June of 1976, involves no counseling work or any responsibilities related to plaintiff's duties between 1969 and 1975. Rather, it appears to involve the numerical calculation and verification of staff requirements for various GSA operations.[15] Plaintiff admits that he has little aptitude for this type of work and that his performance in this assigned position has suffered accordingly. Indeed, the parties readily agree that despite what appears to be plaintiff's sincere efforts to meet the unaccustomed requirements of his new job, his performance has in no way resembled in quality his previous work as a counselor.[16] In short, he is a most unhappy man doing sub-par work in an area totally alien to his interests, his background, and his well-recognized talents.

nently occupy this position, such a designation meant that Kaplan was the "acting supervisor" of that staff element. Kaplan did not receive the grade 13 corresponding to the supervisory position, though, until his formal promotion in October of the following year. See Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 4A.

10. See Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 26, p. 12.

11. See id. at Tab 4A.

12. See id. at Tab 1. As required by regulation, plaintiff first attempted an informal resolution of his grievances. However, according to the testimony of John Phillips, the EEO Counselor chosen by plaintiff for purposes of this informal process, plaintiff did not at that stage allege discrimination regarding Kaplan's selection for the promotion sought by both men. Although there was testimony that plaintiff raised this charge in a December 24 meeting attended by his daughter, the formal complaint filed on January 14, 1976, nowhere refers to the promotion issue. See id. at Tab 1, pp. 6-8.

13. It would appear that because plaintiff's job title and job description had never been reconciled with his actual duties, he was therefore uniquely vulnerable to a lateral transfer to a more "traditional" Buildings Management Specialist position. See note 3 supra.

14. Plaintiff testified that on March 5 he had been rushed by ambulance to the George Washington University Hospital suffering from severe chest pains attributed by him to the tension, anxiety and alleged "harassment" which he experienced at GSA. See Plaintiff's Exhibit # 26 at 5-8. His period of recuperation extended to June 1. The actual date of his reassignment, however, appears to have been April 11. See Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 3, p. 6. See also Plaintiff's Exhibit # 11 at 2.

15. One of the primary functions of the Custodial Management Section appears to be the determination and review of the number of cleaning personnel man-hours required to service certain GSA facilities. Plaintiff's job requires him to "proofread" the GSA Form 469 used for this purpose and to perform numerous mathematical calculations necessary to arrive at exact manpower requirement figures. See Plaintiff's Exhibits # 29 and # 47.

16. In fact, the record reflects that plaintiff's assignment to the Custodial Management Section has proven to be as unsatisfactory to the agency as it has to him. See Plaintiff's Exhibits # 29, # 30, and # 47.

## THE PROMOTION CLAIM

Plaintiff's first contention is that he was wrongfully denied the supervisory position awarded to Jerry Kaplan. He maintains that he was qualified to serve in that job, but failed to receive it only because of race discrimination. He points out that Kaplan, a white man, was temporarily detailed to the position in question for approximately one and one-half years prior to their formal competition for that position, a period far in excess of Civil Service limitations.[17] It is also significant, plaintiff argues, that each of the men temporarily detailed as supervisors of the other four new staff elements of the Management Operations Division were ultimately selected as permanent supervisors.[18] Each of those men, like Kaplan, is white.[19]

■ On the basis of the evidence presented, the Court readily agrees with plaintiff that he was indeed qualified for the position sought. In fact, the review panel which evaluated both him and Kaplan concluded as much.[20] Hence, the Court finds that plaintiff established a *prima facie* case on this claim, whereupon the burden shifted to the defendant agency to show a legitimate, nondiscriminatory reason why plaintiff did not receive the position. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The Court finds further, though, that the defendant agency has adequately met this rebuttal burden. The evidence adduced by both sides reveals that plaintiff was certainly not more qualified than Kaplan for the position sought and according to at least two very important criteria—labor management expertise and supervisory experience—was apparently less qualified.[21]

17. It appears beyond any question that the length of Kaplan's "temporary" assignment to the supervisory position in question violated Civil Service regulations. The Federal Personnel Manual provides, in pertinent part, as follows:

> 8–3.  *Purpose of Details*
>
> \*    \*    \*    \*    \*    \*
>
> (b)  *When prohibited.*
>
> \*    \*    \*    \*    \*    \*
>
> (2) Since extended details also conflict with the principles of job evaluation, *details will be confined to a maximum period of 120 days unless prior approval of the Civil Service Commission is obtained as provided in Section 8–4(f).* All details to higher grade positions will be confined to a maximum initial period of 120 days plus one extension for a maximum period of 120 additional days.
>
> 8–4.  *Agency Responsibilities When Using Details*
>
> \*    \*    \*    \*    \*    \*
>
> e.  *Details to higher grade positions.* Except for brief periods, an employee should not be detailed to perform work of a higher grade level unless there are compelling reasons for doing so. Normally, an employee should be given a temporary promotion instead. If a detail of more than 60 days is made to a higher grade position, or to a position with known promotion potential, it must be made under competitive promotion procedures.

Federal Personnel Manual, Subchapter 8, §§ 8–3, 8–4 (emphasis added). The testimony of James F. Steele, Jr., Regional Commissioner of PBS, reflects that although Kaplan's detail far exceeded 120 days, Civil Service Commission approval was neither obtained nor even sought, on the "judgment" of the Personnel Director that it was not necessary.

18. At the same time that Kaplan was detailed to supervise the new Unions and EEO Administration staff, a "temporary" supervisor was similarly assigned as "Acting Chief" of each of the four other new staff elements, as follows: (1) Manpower Management Branch—Mel Harder; (2) Financial Management Branch—Henry Lockman; (3) Support Management Branch—William Arbacas; and (4) PBS Information—Harry Baker. *See* Plaintiff's Exhibit # 17. *See also* Defendant's Exhibit # H. At trial, Commissioner Steele testified that, like Kaplan, both Lockman and Arbacas now enjoy permanent assignment to those positions. As for Harder and Baker, Commissioner Steele thought that their "temporary" detail still continued.

19. In fact, Commissioner Steele admitted that of the almost eighty newly-designated "key personnel" in the reorganized structure of PBS as of February, 1974, all but one man, Philadelphia Area Manager Jerry Vallery, were white. *See* Defendant's Exhibit # H.

20. *See* note 10 *supra* and accompanying text.

21. Plaintiff candidly admitted at trial that, although he of course had a strong background in EEO matters, his labor/management background was limited at best to some indirect experience through his counseling of individual employees. Moreover, he had no formal training in the labor/management area, nor did he

In light of this evidence, this Court cannot quarrel with the review panel evaluation of plaintiff and Kaplan as "qualified" and "highly qualified," respectively,[22] nor can it conclude that the selection of Kaplan over plaintiff lacked a nondiscriminatory basis.

In essence, the crux of plaintiff's case on this promotion claim is that his competitor was afforded the opportunity to both obtain general supervisory experience and to get on an "inside track" toward the position in question through a temporary assignment to that position which was of illegal duration.[23] In pressing this claim, he places almost exclusive reliance upon Kaplan's illegal detail and upon the fact that this questionable personnel practice was also employed to the benefit of the "temporary" supervisors in each of the other new staff elements of the Management Operations Division.[24] Yet plaintiff has failed to present any evidence suggesting that this practice discriminated against him, or against others, on racial grounds.[25] Nor has he offered any evidence tending to

prove that the reasons justifying the Kaplan selection were merely a "pretext" for such discrimination. *See McDonnell Douglas Corp. v. Green, supra,* at 804–05, 93 S.Ct. 1817. Hence, while the Court is sympathetic to the fact that plaintiff was placed at a distinct competitive disadvantage by virtue of Kaplan's unduly long interim appointment,[26] it discerns no basis upon which it can view this irregularity as amounting to a Title VII violation.[27] Accordingly, plaintiff's promotion claim must fail.

## THE RETALIATION CLAIM

Separate and apart from his challenge to the Kaplan selection, plaintiff also challenges GSA's treatment of him subsequent to his initiating an EEO action in connection with his non-selection. He claims that he has been singled out by his superiors, particularly Kaplan and Kane, and treated in a manner totally unbefitting a man of his background and proven abilities. The sum and substance of the defendant agency's

---

have any experience whatsoever in this area at the institutional, as opposed to the individual, level. He was similarly lacking in any supervisory experience, although he had some seminar training in this area. *See* Plaintiff's Exhibit # 50. Kaplan, on the other hand, though he could not match plaintiff's strong background in EEO counseling work, had experience in both areas, particularly the labor/management area, which is heavily stressed in the position description. *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 26. Moreover, even aside from the supervisory experience obtained by Kaplan during his illegal detail, he had come to that position by way of a management trainee program which, according to the testimony of James E. Zaiser, provided him with a strong supervisory background. *See id.* at Tabs 4A and 26B.

**22.** *See* note 10 *supra* and accompanying text. The review panel, for example, accorded Kaplan more than twice as many points as plaintiff in the category of experience, presumably because of plaintiff's lack of experience in the labor/management area. *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 26, p. 11.

**23.** *See* note 17 *supra* and accompanying text.

**24.** *See* note 18 *supra* and accompanying text.

**25.** Plaintiff alleged at trial that the entire reorganization of PBS was effected, in his view,

simply to disadvantage blacks such as himself, yet there is no evidence which supports such a view. Neither has plaintiff adduced any credible evidence which would support his argument that the "temporary" assignments of Kaplan and the four other new supervisors were racially discriminatory actions. Plaintiff did not seek to demonstrate, for example, whether any of the potential or actual competitors for those other supervisory positions were black persons like himself. His attempt to show a "pattern" of alleged racial discrimination suffers accordingly.

**26.** Let there be no mistake about the Court's conclusion that plaintiff was wronged by GSA when Kaplan was allowed to obtain excess supervisory experience in direct contravention to the principles of merit promotion. The Court is quite frankly appalled by GSA's blatant disregard for Civil Service regulations as reflected in this record and in the testimony of Commissioner James F. Steele, Jr. *See* note 18 *supra.*

**27.** It seems to the Court that the proper means by which Kaplan's selection could have been challenged would have been by way of a Civil Service appeal based upon the clear illegality of the agency's action. *See* note 17 *supra* and accompanying text.

conduct toward him since December of 1975, he maintains, amounts to discriminatory retaliation within the meaning of 42 U.S.C. § 2000e–3(a).

The evidence supporting this claim is substantial. Plaintiff testified that subsequent to Kaplan's selection, he initiated an EEO action wherein he challenged the agency's overall treatment of him.[28] He also wrote to the National Administrator of GSA, Mr. John F. Galuardi, on December 1, 1975, voicing several complaints and threatening a formal discrimination suit.[29] Not long thereafter, plaintiff testified, he was advised by Kaplan that he could no longer occupy a counseling position at the GS–12 level because the job assertedly could not "justify" that grade. At that time, plaintiff had been a full-time counselor for almost seven years, the last three and one-half of which as a GS–12. Plaintiff testified that he was given the choice of either continuing in his present position under the title of Equal Employment Opportunity Specialist as a downgraded GS–11 or else accepting a transfer out of the counseling field to a more traditional Buildings Management Specialist job. In the Spring of 1976, after plaintiff had steadfastly refused a downgrade, he was transferred to a custodial staffing position in which his counseling abilities and experience are not utilized.[30] Plaintiff's many attempts to obtain another position more suited to his background have been to no avail.[31]

In its defense on this claim, GSA has adduced certain evidence which could tend to undermine plaintiff's assertions of retaliation. It has shown, for example, that even prior to his unsuccessful competition for the position now occupied by Kaplan, plaintiff sought to rectify for once and for all the inconsistency between his job description and the responsibilities which he performed. Thus, as early as in July of 1975, plaintiff made a formal request for a "desk audit" so that he could be classified as an Equal Employment Opportunity Specialist.[32] It was that effort on *plaintiff's* part, the defendant agency contends, which ultimately resulted in the personnel determination that plaintiff's counseling duties could not support a grade 12 and that he would therefore have to accept a downgrade if he wished to be an Equal Employment Opportunity Specialist. The defendant agency's position, therefore, is that plaintiff's transfer was not undertaken as a reprisal, but rather was prompted by the sterile personnel determination that the precise job position sought by plaintiff could not support his established grade.[33]

Upon its careful consideration of all the evidence presented, however, the Court stands unpersuaded that GSA's treatment of plaintiff since late 1975 has been pure of any retaliatory efforts. From the totality of this evidence, the following picture emerges: Plaintiff is a man of superior abilities and dedication as a counselor whose incipient talents were recognized by his supervisors while he was laboring in an unrelated field. At the specific request of his agency, he rose to the challenge of this new profession and served it with distinc-

---

**28.** *See* note 12 *supra* and accompanying text. Additionally, on February 5, 1976, plaintiff filed a further complaint alleging "harassment and reprisal." *See* Defendant's Exhibit # U, at 6–8.

**29.** *See* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 2C.

**30.** *See* notes 14–16 *supra* and accompanying text.

**31.** The evidence reveals that plaintiff has engaged in repeated, patient, attempts to obtain a lateral transfer from his present position since the time of his reassignment in early 1976. *See* Plaintiff's Exhibits # 16 and # 16A.

**32.** *See* Defendant's Exhibit # U at 27. In this letter requesting a desk audit, dated July 18, 1975, plaintiff also advised that at that time he was "in the process of filing a formal charge of discrimination because of race and age." *Id.*

**33.** This position is supported by the trial testimony of Robert E. Skinner, the Position Classifications Specialist who dealt with plaintiff's efforts to be reclassified as an Equal Employment Opportunity Specialist. *See also* Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 9 (Affidavit of Robert E. Skinner).

tion. Three years later, at a time when GSA was undoubtedly under pressure to provide equal employment opportunity services to its employees, he once again responded to his agency's call and became an integral part of its new Equal Employment Opportunity Program.[34] Throughout this service, though, plaintiff never really received full recognition for his work since his supervisors obtained much-needed counseling services from him while continuing his official designation as a Buildings Management Specialist.[35] Then, after seven years of counseling work, the last three and one-half years of which as an equal employment opportunity counselor at grade 12, plaintiff is told that the job he has been performing at the agency's request (and, by all indications, to its substantial benefit) could no longer justify his grade level of long standing and that to maintain his grade he must accept assignment to a job which bears no logical relation to his interest, skills or experience.

■ It appears to the Court, and in the absence of any persuasive evidence to the contrary the Court so finds, that this plaintiff has been effectively used by his agency when it needed him, but has now been inexcusably abused by that same agency[36] after alleging race discrimination. This Court simply cannot fathom why an agency would suddenly take an employee of plaintiff's demonstrated worth and place him in a position where he is of value neither to the agency nor to himself. It can draw no other conclusion than that plaintiff's treatment by GSA since late 1975 can be explained only as an inconsiderate retaliation for his efforts to seek redress for his complaints of racial discrimination.[37] Such

---

34. *See* note 6 *supra* and accompanying text.

35. *See* note 3 *supra*. John J. Province, the GSA official who first brought plaintiff into counseling and later relied upon him heavily in connection with GSA's EEO program (*see* text accompanying note 6 *supra* ), has spoken about plaintiff's position classification as follows:

> I first met Mr. Joseph Dual several years ago when he was a carpenter. At that time he was dissatisfied with his working conditions and had filed a complaint. I was involved in the complaint and I got to know Mr. Dual rather well. I was definitely impressed by him and thought he would be an excellent person to work in Equal Employment Opportunity. He impressed me as having the potential to do much higher level work and I was instrumental in getting him out of the trades and into the General Schedule. This occurred several years ago, before we had Equal Employment Opportunity positions. Since we *did not* have any Equal Employment Opportunity positions when we brought him over from the trades we put him into a general type position. *We rationalized it by thinking that there are employees who work in general positions without performing all of the functions described for that position but who do a very good job.* We did not think that it was wrong to insert Mr. Dual into a general position where it was known that he would not perform all of the functions. Mr. Dual realized, as did I, that although his Position Description was that of a Building Management Specialist and had several duties that he was going to be doing one hundred percent Equal Employment Opportunity work.

Plaintiff's Exhibit # 1 (Defendant's Exhibit # A) at Tab 20 (Affidavit of John J. Province).

36. It is noted that much can change in a federal agency with the passage of time, especially during a period of reorganization. In this case, it appears to the Court that the informal personnel policies which were once so readily exploited by plaintiff's superiors are not now satisfactory to those who now occupy the pertinent positions of authority. While such a development could under some circumstances be attributed to the vagaries of bureaucratic change, such an explanation is not sufficient to justify the callous treatment received by this plaintiff.

37. The Court regards as most significant in this connection the testimony of Robert R. Kane, the GSA official who was directly responsible for plaintiff's reassignment. Under questioning by plaintiff's counsel at trial, Kane admitted that he effected this transfer while plaintiff was undergoing emergency hospitalization; that he located plaintiff's new position by comparing available openings with plaintiff's official job description; and that he readily made a determination of "compatibility" despite his acknowledged awareness of the fact that plaintiff's official job description had borne no relation whatever to his duties over the previous seven years. Moreover, it was also admitted by Kane that plaintiff is the only PBS employee who he knew to have been physically relocated in that way and that no PBS employee other than plaintiff has been subjected to a downgrade or to such a lateral transfer under the threat of a downgrade.

treatment has been expressly proscribed by Congress [38] and should not be regarded lightly by the courts.

## APPROPRIATE RELIEF

The only matter remaining is a determination of relief appropriate to the Court's finding of discriminatory retaliation. The relevant portion of Title VII, Section 706(g), as amended, provides as follows:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g). As the Supreme Court has noted, this section "vested broad equitable discretion in the federal courts to 'order such affirmative action as may be appropriate . . .'" *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). Such equitable relief, of course, must be carefully tailored to the circumstances presented by each case. *See, e. g., Rodri-*

*guez v. East Texas Motor Freight,* 505 F.2d 40, 51 (5th Cir. 1974), *rev'd on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Young v. Edgcomb Steel Co.,* 499 F.2d 97, 98–99 (4th Cir. 1974).

In this case, the Court finds that the plaintiff is entitled to immediate reassignment to a counseling position such as he held prior to his retaliatory transfer.[39] He should be allowed to resume his prior duties (or those duties currently in existence which are most nearly identical to those previously performed by plaintiff) without any loss of grade or future threat of same. Finally, this "reinstatement" should be accomplished with the maximum of dispatch and the minimum of inconvenience to the plaintiff. He is not to be further harassed.

This Court of course has complete confidence in the ability of the defendant agency to afford plaintiff the relief to which he is entitled, particularly since it is quite obvious to the objective observer that it would be in the agency's best interest, as well as in plaintiff's, that it do so. The Court notes in this connection, however, that plaintiff has made a formal request for punitive damages [40] and that there is authority supporting the award of such damages in egregious cases such as this one.

---

**38.** Section 704(a) of Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a).

**39.** The Court is mindful of the determination evidently made by GSA to the effect that the position of Equal Employment Opportunity Specialist cannot be classified at a grade higher than a GS–11. Despite a certain amount of apprehension on this matter, the Court will nevertheless accommodate that personnel rule and not require GSA to abrogate it in plaintiff's case. Thus, the defendant agency may, if it

insists, simply reassign plaintiff to his former counseling duties at his present grade 12 under his long-standing classification of Buildings Management Specialist. Such an arrangement was generally satisfactory to all parties prior to the agency's retaliatory transfer of plaintiff and should be no less satisfactory throughout the remainder of plaintiff's government career.

**40.** Plaintiff also seeks an award of compensatory damages for "pain and suffering" and for substantial medical expenses incurred by him in connection with at least two hospitalizations subsequent to the filing of his formal administrative complaint of racial discrimination in January, 1976. Plaintiff's personal physician, Dr. H. Robert Birschbach, testified that the extraordinary stress experienced by plaintiff at work since late 1975 was in his opinion a "causative factor in producing" plaintiff's chest pains and related health difficulties. Yet at the same time the doctor admitted that he could not rule out other causes for plaintiff's condition since it would be necessary for plaintiff to undergo additional testing (*i. e.,* an echocardiogram) to prove with certainty that his condition was not congenital or idiopathic. As regards

*See Claiborne v. Illinois Central R. R.,* 401 F.Supp. 1022, 1023–27 (E.D.La.1975); *Tooles v. Kellogg Co.,* 336 F.Supp. 14, 18 (D.Nev.1972); *Gary v. Industrial Indemnity Co.,* 7 F.E.P. Cases 193, 196 (N.D.Cal.1973); *Dessenberg v. American Metal Forming Co.,* 6 F.E.P. Cases 159, 161 (N.D.Ohio 1973); *United States v. Detroit Edison Co.,* 6 F.E.P. Cases 612, 642–43 (E.D.Mich.1973). *See also* Note, *Implying Punitive Damages in Employment Discrimination Cases,* 9 Harv.Civ.Rights—Civ.Lib.L.Rev. 325, 342–45 (1974); Comment, *Employment Discrimination and Title VII of the Civil Rights Act of 1964,* 84 Harv.L.Rev. 1109, 1259–69 (1971).[41] The matter of punitive damages will accordingly be held in abeyance by the Court pending the agency's prompt compliance with the judgment issued today.

An appropriate Order will be entered. Plaintiff's counsel shall submit an application for the award of costs and attorneys' fees.

## ON MOTION TO AMEND JUDGMENT

Presently before the Court is plaintiff's motion pursuant to Rule 59(e), Federal Rules of Civil Procedure, to amend the Court's Judgment dated July 28, 1977. The Court ordered judgment for plaintiff on his retaliation claim and ordered defendant to reassign plaintiff to a counseling position and to desist from further retaliation or harassment. In its motion to amend the Court's judgment, plaintiff requests that the Court order: (a) restoration of the annual and sick leave expended by plaintiff for health problems allegedly resulting from GSA's retaliation; and (b) expungement of derogatory information placed by GSA in plaintiff's personnel file. For the reasons set forth briefly below, the Court grants plaintiff's requests for restoration of lost leave and for expungement.

### A. *Restoration of Lost Annual and Sick Leave.*

Plaintiff requests restoration of leave used for three periods of hospitalization and for other, unspecified periods.[1] Plaintiff intends to provide medical certificates verifying that these latter periods were in re-

plaintiff's request to be compensated for his "pain and suffering," only one reported decision known to this Court has ever authorized such an award under Title VII and that judgment was later reversed. *See Humphrey v. Southwestern Portland Cement Co.,* 369 F.Supp. 832, 834 (W.D.Tex.1973) (compensation for "psychic harm"), *rev'd* 488 F.2d 691 (5th Cir. 1974). In the two cases cited to the Court by plaintiff on the question of compensatory damages, *Harrington v. Vandalia-Butler Bd. of Ed.,* 418 F.Supp. 603, 12 E.P.D. Cases ¶ 11,170 (S.D.Ohio 1976), and *Evans v. Sheraton Park Hotel,* 5 E.P.D. Cases ¶ 8079 (D.D.C. 1972), *aff'd,* 164 U.S.App.D.C. 86, 95, 503 F.2d 177, 186 (1974), it is far from clear that the damages assessed therein were truly compensatory awards. The same can be readily said for two other cases which would at first glance appear to support plaintiff's request. *See Rosen v. Public Service Elec. & Gas Co.,* 477 F.2d 90, 95–96 (3d Cir. 1973); *Tidwell v. American Oil Co.,* 332 F.Supp. 424, 437 (D.Utah 1971). In sum, this Court feels compelled to align itself with the near-unanimous view that compensatory damages are not recoverable under Title VII and accordingly finds that they cannot be awarded in this case. *See Pearson v. Western Electric Co.,* 542 F.2d 1150, 1151 (10th Cir. 1976); *Equal Employment Opportunity Commission v. Brotherhood of Painters, Decorators*

*and Paperhangers of America, Local 857,* 384 F.Supp. 1264, 1269 n. 1 (D.S.D.1974); *Loo v. Gerarge,* 374 F.Supp. 1338, 1341–42 & nn. 6–7 (D.Haw.1974); *Howard v. Lockheed-Georgia Co.,* 372 F.Supp. 854, 855–56 (N.D.Ga.1974); *Van Hoomissen v. Xerox Corp.,* 368 F.Supp. 829, 835–38 (N.D.Cal.1973); *Attkisson v. Bridgeport Brass Co.,* 5 F.E.P. Cases 919 (S.D. Ind.1972); *Tooles v. Kellogg Co.,* 336 F.Supp. 14, 18 (D.Nev.1972). *See also* Comment, *Employment Discrimination and Title VII of the Civil Rights Act of 1964,* 84 Harv.L.Rev. 1109, 1259 (1971).

**41.** *But see, e. g., Pearson v. Western Electric Co.,* 542 F.2d 1150, 1151–52 (10th Cir. 1976); *Equal Employment Opportunity Commission v. Detroit Edison Co.,* 515 F.2d 301, 308–09 (6th Cir. 1975); *Presseisen v. Swarthmore College,* 71 F.R.D. 34, 45–46 n. 12 (E.D.Pa.1976); *Loo v. Gerarge,* 374 F.Supp. 1338, 1341–42 (D.Haw. 1974); *Van Hoomissen v. Xerox Corp.,* 368 F.Supp. 829, 835–38 (N.D.Cal.1973).

**1.** Although the testimony of plaintiff and of his personal physician, Dr. H. Robert Birschbach, is not entirely clear on this matter, it appears that plaintiff's three hospitalizations occurred in mid-December, 1975, March, 1976, and March, 1977.

sponse to medical necessity. Plaintiff contends that GSA's harassment and retaliation caused him severe health problems requiring exhaustion of all of his accumulated annual and sick leave. Defendant responds that testimony at trial cannot support a finding that the stress suffered by plaintiff at his job was the proximate cause of his health difficulties.

■ The Court concludes that the evidence supports the finding that plaintiff's illness was proximately caused by defendant's retaliatory actions and that the restoration of lost leave under these circumstances is a proper exercise of the court's broad discretionary power to grant relief for violations of Title VII. 42 U.S.C. § 2000e–5(g). In its Memorandum of July 28, 1977, the Court concluded that plaintiff's treatment by GSA since late 1975, specifically his downgrading to a job unrelated to his skills and experience, was in retaliation for plaintiff's seeking redress for his complaints of racial discrimination.[2] Plaintiff maintains that the extraordinary job stress resulting from his downgrading and defendant's harassment caused his health problems. At trial, Dr. Birschbach testified that the stress experienced by plaintiff at work since late 1975 was in his opinion a "causative factor in producing" plaintiff's health difficulties. The doctor also testified that plaintiff could function well without the stress experienced at work after his downgrading.

Defendant responds by emphasizing that the doctor could not conclusively state that the job stress was the sole cause of plaintiff's condition. That the doctor's conclusion was qualified in this manner is not surprising; the possibility that other causes were a factor in plaintiff's condition always exists.[3] Plaintiff, however, is not required to negate every other theory of causation,

see Christie v. Callahan, 75 U.S.App.D.C. 133, 148, 124 F.2d 825, 840 (1941), and this qualification of the doctor's testimony does not detract from the doctor's opinion that job stress was a contributing cause of plaintiff's health problems. Moreover, the doctor's firm testimony was that the plaintiff could have performed his job well in the absence of the stress resulting from defendant's harassment. Considered in its entirety, the doctor's testimony, unchallenged by defendant, fully supports the finding that defendant's retaliatory actions resulting in extraordinary stress on plaintiff was the proximate cause of plaintiff's health problems requiring hospitalization and use of annual and sick leave.[4] See Hicks v. United States, 167 U.S.App.D.C. 169, 182–83, 511 F.2d 407, 420–21 (1975).

As the Court stated in its Memorandum of July 28, 1977, it has broad discretionary power to grant relief appropriate to its finding of retaliation. The Supreme Court has said that "federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of racial discrimination . . . ." Franks v. Bowman Transportation Co., 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). In this case the Court has found that defendant retaliated against and harassed plaintiff and that plaintiff's health problems since late 1975 were caused by this retaliation and harassment. These particular circumstances justify an order restoring leave used by plaintiff during his three hospitalizations and other periods since late 1975. Plaintiff shall be restored lost leave for those periods for which he submits to GSA medical certificates from Dr. Birschbach verifying that leave taken during such periods was in response to his medical needs.

**2.** See Court's Memorandum of July 28, 1977, at 15.

**3.** The doctor testified that additional testing of plaintiff would be necessary to determine with certainty that his condition was not congenital or idiopathic.

**4.** This finding is not inconsistent with the Court's denial of plaintiff's request for compensatory damages. In its Memorandum of July 28, 1977, at 18–19 n. 40, the Court adhered to the "near-unanimous view that compensatory damages are not recoverable under Title VII." The Court made no finding regarding whether the job stress suffered by plaintiff was proximate cause of his health problems.

### B. Expungement of Derogatory Information in Plaintiff's GSA Personnel File.

Plaintiff requests expungement specifically of three letters of unsatisfactory performance given him after his downgrading and of any other derogatory information contained in GSA's files. Defendant urges that this request be denied because the letters are accurate and there is no evidence of retaliatory intent underlying the letters.

The Court concludes that expungement of the three letters is appropriate relief under the circumstances of this case. Defendant's retaliation against plaintiff included downgrading him into a position for which he was not well-qualified.[5] Plaintiff's poor performance in this position and the consequent letters from his superiors regarding his unsatisfactory performance are not disputed. But this poor performance directly resulted from defendant's wrongful placement of plaintiff into a position not suited to his interest, skills, or experience. The fact that the letters accurately criticize plaintiff's performance and do not have a retaliatory intent is irrelevant. The letters would not exist but for the retaliatory conduct of defendant. The Court already has ordered plaintiff's reassignment to a counseling position such as he held prior to his transfer to the downgraded position. Expungement of the letters criticizing plaintiff's performance after the wrongful transfer will further eliminate the injurious effects to plaintiff of defendant's discriminatory actions.

The Court's order of expungement in this case is a proper exercise of its broad relief powers under Title VII. *See Franks v. Bowman Transportation Co., supra.* The Court's order also accords with the general rules for granting expungement. *See, e.g., Chastain v. Kelley,* 167 U.S.App.D.C. 11, 510 F.2d 1232 (1975); *Paton v. LaPrade,* 524 F.2d 862 (3d Cir. 1975). Under the circumstances of this case, in which the existence of the derogatory letters is the result of defendant's violation of plaintiff's statutory rights, the continuing harm to the plaintiff resulting from the letters clearly outweighs any interest GSA may have in retaining them.[6]

---

5. *See* note 2 *supra* and accompanying text.

6. The Court has no basis for ordering expungement of additional "derogatory information" claimed by plaintiff to be in GSA's file. The expungement order will be limited to the three letters that the Court inspected *in camera.*