Robert A. McCORMICK, Plaintiff,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

Civ. A. No. 78–2066.

United States District Court, District of Columbia.

Nov. 30, 1982.

Kenneth M. Trombly, Washington, D.C., for plaintiff.

William R. Morel, Asst. Corp. Counsel, D.C., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

In this Title VII[1] case, a white male claims that he was denied a promotional opportunity, demoted, and then reassigned

---

1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(a) (1976).

to a dead-end job because of discrimination on account of his race and gender. The Court conducted a bench trial, and it finds that plaintiff has met the requisite burden of proof as to his claim of race discrimination against defendant District of Columbia, his employer.[2] Plaintiff has succeeded in showing the pretextual nature of the reasons advanced by the District for a series of adverse personnel actions taken against him from 1976 to 1980. He has also made out a violation of the District of Columbia Human Rights Law, D.C.Code § 1–2501 et seq. (1981). The Court's findings of fact and conclusions of law are set forth in greater detail below.

## I

The plaintiff, Robert A. McCormick, joined the District of Columbia government in 1968. He was 41.[3] McCormick was assigned to the Educational Services Unit in the Department of Human Resources as a GS–12 Executive Assistant. The following year he was promoted to Director of the unit, a GS–13 rank. McCormick remained in this capacity until 1976, having undergone a title change in 1973 to Chief of the Education Assistance Branch. His immediate superior was first Dr. William Rumsey,

then Dr. Ettyce Moore. Both had grades of GS–15.

During this time McCormick nurtured the District's Student Loan Program from infancy to maturity. He made the initial contacts with area banks, coordinated the participation of students, educational institutions, banks, and relevant federal agencies, and he supervised the application, disbursement, and collection processes, with the help of only a small staff.

In 1976, the then Director of Human Resources, Joseph P. Yeldell, a black, decided to reorganize the Human Resources Department. In a report dated April 9, 1976, Yeldell described the reorganization in general terms. Subsequently he summoned 58 employees to a luncheon and there announced job shifts for each of them, to take effect in May. McCormick was not included in this "functional realignment," as it was labeled, but as a result of the realignment he acquired a new boss, Eloise Turner, a black.[4] Ms. Turner was a former elementary school teacher, who became a child development specialist in the District government, acting as Chief of the Division of Child Development (another unit within the Department of Human Resources). Subsequently she replaced Moore and as-

---

**2.** As to defendant James A. Buford, sued in both his official and individual capacities, plaintiff has failed to carry his burden. The complaint against Buford will therefore be dismissed with prejudice.

**3.** Previously McCormick had served in the Marine Corps, from 1943 to 1963, and since 1963 had held a series of jobs in the private sector, the latest of them with an educational training business. In the applications he filed with the federal and District governments, he specified "no chance for advancement" as his reason for seeking a new job. Because McCormick's competence is at issue in this lawsuit, it is worth quoting the recommendation given to the District of Columbia regarding him by his last employer. The following notes of a telephone conversation were in McCormick's employment file, one of defendant's exhibits:

 1. *Leave*—used very little time. Worked long hours—not a clock watcher.
 2. *Intelligent*—meets public well and is very familiar with government agencies.
 3. was a very responsible person—very creative and seemed well qualified.

**4.** The plaintiff made much of the fact that Turner had been married to Yeldell's first cousin and frequently saw Yeldell in social situations. Yeldell's alleged nepotism and "cronyism" were the subjects of an investigation conducted in 1976 by the District's Office of Municipal Audit and Inspection in response to several newspaper stories. An interim report stated that a review of personnel records had not revealed "that [Turner] was given preferential treatment by Joseph P. Yeldell in connection with her [initial] appointment," but the final report, dated February 1977, disclosed that when Turner was first hired by the department in 1972 "the position . . . [was] not advertised as required. As a result, appropriate recruitment efforts were not made to assure that the best qualified individuals available were selected." The report concluded that "[t]he deficiencies noted during our review in recruitments, appointments, and promotions raise a question as to the credibility of the DHR personnel process." No nepotism was found, however.

sumed the new title of Chief, Office of Educational Affairs (later changed to Acting Chief). It was at this point that McCormick's employment difficulties began.

On September 15, 1976, barely four months after her new assignment took effect, Turner wrote McCormick that as of that date he was "reassigned to Special Assistant for Student Aid." Turner also announced that she would take over McCormick's duties as Chief of the Education Assistance Branch, so that his subordinates would report directly to her, and McCormick would work alongside the individuals whom he had previously supervised. No personnel action forms or other paperwork accompanied this demotion.

A month later, McCormick filed an informal grievance protesting Turner's actions.[5] On November 5, 1976, two weeks after McCormick wrote a second grievance memorandum to Turner, he received yet another notice of reassignment, this one from Bernard Phifer, Deputy Assistant Director for State Agency Affairs, also a black. Phifer's memo transferred McCormick out of the education field altogether, placing him in the District's Food Stamp Program.[6] McCormick received the notice on a Friday morning, and he was to report to the new assignment on the following Monday.

The new assignment lacked a job description and required McCormick to report to Sandra Datcher, a black, whose rank was a GS–12, a grade lower than his. In January 1978, on the advice of an attorney, he formally refused to accept any more work from her. See pp. 643–644 *infra*. Unbeknownst to McCormick, during the 14 months since he had left Turner's employ, Turner and her superior, Jacqueline Johnson, Assistant Director for State Agency Affairs, also black, had been working in tandem to discipline him for poor performance.[7] One of their recommendations included a demotion of plaintiff to GS–9.[8] Their attempts to gain authorization from the proper personnel officials was unsuccessful, however, for lack of adequate documentation. Johnson was also a superior of Datcher. When Datcher reported McCormick's refusal to accept additional work from her, Johnson renewed her complaints about McCormick in a memorandum to Virgil McDonald, Assistant Director for Administration.

McDonald—one of the few principals involved in this sorry sequence of events who actually complied with federal and District personnel regulations—rebuffed Johnson. He noted that since no description had ever been prepared for the job McCormick held, there was no standard by which to measure his performance.[9] McDonald also observed

5. Turner, as his supervisor, was the individual with whom the grievance was required to be filed.

6. The formal name of the program was the Financial Assistance Branch of the Social Services Program Division. The Social Services Division was a counterpart of the Office of Educational Affairs. Both of these divisions were part of the Office of State Agency Affairs, which in turn was part of the Department of Human Resources.

7. Johnson, like Turner, was one of the eight appointees to the Department of Human Resources who had been hired without the posting of a vacancy notice.

8. This recommendation was contained in a three-page memorandum written by Turner after she stripped McCormick of his supervisory duties. It is dated October 5, 1976. Ms. Turner testified at trial that she did not show the memo to anyone until after McCormick had been reassigned out of her division on Novem-

ber 8. She offered no justification for allowing such *post hoc* use to be made of the memo, which was addressed to Glennard Buchanan, Chief [of] Employee Relations, but apparently not requested by him. A carbon copy was directed to Johnson. The GS–9 recommendation was made in the context of "overall program requirements" for the State Education Services Division, and it is therefore difficult to see what force the recommendation would have been expected to have once McCormick had left that division. Nevertheless, there is evidence that Johnson attached the memo to her letters seeking authorization to discipline McCormick.

9. McDonald also observed that McCormick had received regular pay increases and satisfactory ratings since the reassignment. "Therefore," he wrote, "Mr. McCormick had good reasons to believe he was performing at an acceptable level of competence." McCormick's personnel file, one of defendant's exhibits, indicates that McCormick has never received anything below

that McCormick's transfer into the Food Stamp Program had been irregular for another reason: since he was subordinated to someone of lower grade, the assignment was a reduction in rank that could properly have been processed only under procedures for adverse action. This, too, had not been done. McDonald recommended that Johnson "assign Mr. McCormick to an established position commensurate to his grade and then properly document his performance."

McDonald's letter apparently ended Johnson's efforts formally to discipline McCormick, but McCormick thereafter was simply given no work assignments. It is unclear what steps, if any, Johnson took to comply with McDonald's recommendation, except that on December 29, 1979, nearly two years after the recommendation was made, McCormick was finally transferred to a new position: Security Officer in the Human Resources' Office of Inspection. McCormick testified that he did not want the job, had little background for it, and regarded it as having poor potential for advancement. Accordingly, he filed a grievance regarding the transfer. McCormick remains a GS–13 today, having been detailed to be Acting Chief of the Inspection Office's Division of Examinations in June 1980, and to Acting Chief, Food Stamp Fraud Division, in April

1981. A 1981–82 review of his work rated it excellent in five of six categories.[10] Meanwhile, Turner received a promotion to GS–14 in June 1982 and the "acting" was finally removed from her title.

## II

Under Title VII, the plaintiff has the burden of establishing a *prima facie* case of racial or gender discrimination by a preponderance of the evidence.[11] The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "If the defendant carries this burden and if his evidence is credible, the plaintiff must then show by a preponderance of the evidence that these legitimate reasons offered by defendant were not relevant to his case and thus were merely pretextual." *Garner v. Boorstin,* 690 F.2d 1034 at 1036 n. 3 (D.C. Cir.1982) (per curiam).[12]

Plaintiff established his prima facie case through testimony and exhibits showing that although white, he worked in a milieu in which he was a minority;[13] that he was denied an opportunity to compete openly for a promotion he almost certainly would have wanted;[14] that many years of

---

a satisfactory rating since he began working for the District government.

**10.** The sole criticism of McCormick was that his relationships with his co-workers could be stronger.

**11.** The most widely cited model for a prima facie case is that given by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It requires a plaintiff to show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open....

411 U.S. at 802, 93 S.Ct. at 1824. The model was subsequently modified to take account of failure-to-promote cases and should be modified where appropriate in other types of Title VII cases. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1093–94 n. 6, 67 L.Ed.2d 207 (1981).

**12.** The Court of Appeals has since observed that "an 'extremely strong' prima facie case may lend special probative force to a claim of pretext. Indeed, an especially strong prima facie case combined with a relatively weak rebuttal by the defendant may entirely obviate any need for further inquiry into pretext." *Milton v. Weinberger,* 696 F.2d 94, 100 n. 17 (D.C. Cir.1982). Although this may well be a case of the kind referred to in *Milton,* in order to afford the District every opportunity, the Court here also reaches the question of pretext.

**13.** See *Parker v. Baltimore and Ohio Railroad Co.,* 652 F.2d 1012, 1017–18 (D.C.Cir.1971), *Daye v. Harris,* 655 F.2d 258 (D.C.Cir.1981).

**14.** McCormick was precluded from actually applying for the post of Director of State Education Services because no notice of vacancy ever was posted. Indeed, no advance warning was given that the State Education Services was to be affected by the realignment. The director's April 9, 1976 announcement, one of defendant's

experience in the education office made him at least arguably qualified for the position in question; and that he was passed over in favor of a black woman whose background was that of an elementary school teacher and child development specialist. In addition, since part of plaintiff's claim concerns his demotion and subsequent reassignment, his *prima facie* case had to include evidence that he was qualified for his own job, which it clearly did.[15]

▉ The reasons advanced by the District of Columbia to justify its treatment of McCormick were not as precisely framed as they might have been.[16] However, its major themes appear to be: the neutrality of the realignment, a denial that the realignment effected a promotion in Turner's case, the reasonableness of not including McCormick in the realignment, and McCormick's poor work performance.

▉ Joseph Yeldell, then director of the Department of Human Resources, was the main defense witness regarding the realignment.[17] Plaintiff does not question that Yeldell had no improper motive in effecting the realignment in general. The department needed a reorganization, and Yeldell, an active and aggressive administrator, attempted to provide the necessary leadership through the realignment. Nevertheless, the Court discounts his testimony that

Turner's participation in the realignment did not constitute a promotion.[18] The job to which Turner was "realigned" had previously been held by a GS–15, Ettyce Moore, and before her by William Rumsey, also a GS–15. Turner and McCormick, prior to the realignment, were both at GS–13. As a child development specialist Turner had supervised eight employees, the most senior of which was at a GS–11. In the new post she was ultimately given responsibility for 16 individuals including McCormick, a GS–13. The heads to two units would now be reporting to her. She clearly was elevated despite Yeldell's testimony to the contrary, and despite the absence of an immediate pay increase. Ultimately she did receive a promotion to GS–14 and a raise in pay.

It is noteworthy that personnel officials had approved the realignment only on the theory that it was a mere rotation of mid-level managers, but did not constitute a circumvention of competitive promotion requirements. If all was regular about Turner's "realignment," she would not have been kept on temporary detail—a status meant under the regulations to last no longer than 120 days—*for six years,* finally to have the "acting" eliminated from her title in 1982 after the hurried preparation of a vacancy notice and no interviews either with her or the one other person "considered" for the job.[19]

exhibits, includes nothing about changes in that division although it does mention changes affecting the affiliate divisions under the Office of State Agency Affairs. Thus, intentionally or otherwise, there was not even informal notice that the job held by Moore was to become vacant. In a Title VII case, it is sufficient if the plaintiff "might have reasonably expected selection for promotion under the defendant's ongoing competitive promotion system." *Pettit v. United States,* 488 F.2d 1026 (Ct.Cl.1973). The post given to Turner was the logical step for McCormick. He was interested in advancement, as evidenced by the reason he gave for leaving his previous job. See note 3, *supra.*

**15.** See *Bundy v. Jackson,* 641 F.2d 934, 945 (D.C.Cir.1981) ("courts must adjust the definition of a prima facie case and the allocation of burden of proof to the differing situations that may arise in Title VII cases").

**16.** The requirement that the defendant's explanation be precise flows in part "from the re-

quirement that the plaintiff be afforded 'a full and fair opportunity to demonstrate pretext,'" *Burdine, supra* 450 U.S. at 258, 101 S.Ct. at 1096. Because the plaintiff in this case was able to show pretext, defendant's imprecision did not foreclose that opportunity.

**17.** Most of defendant's evidence consisted of oral testimony. It submitted far fewer documentary exhibits than did plaintiff.

**18.** Because this testimony is not credible, it need not be rebutted as pretextuai. See *Garner v. Boorstin,* 690 F.2d 1034, 1036 n. 3 (D.C.Cir. 1982) (per curiam). Nevertheless, there is ample evidence of pretext as well.

**19.** There was testimony that after the post had been allegedly vacant for six years, the vacancy notice itself was posted for a mere two days. The District's sudden sense of urgency is difficult to understand.

■ On the other hand, Yeldell's testimony is credible as to the reasonableness of not including McCormick in the realignment. Although twelve GS–13's and two GS–12's were among the 58 people included, the remainder were from GS–14 and above. Also, 20 of those included were white. Yeldell testified that his choice of which GS–13's to include was based on his view of the individuals' management skills. McCormick's nonselection may simply show that Yeldell did not consider McCormick one of his better managers, not someone he wanted to groom for taking on additional responsibilities. While the Court might disagree with this perception, it is not the business of a court hearing a Title VII case to "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Milton v. Weinberger,* 696 F.2d 94, 100 n. 17 (D.C.Cir.1982).

■ Credible as Yeldell's testimony in this regard might be, however, it is irrelevant. McCormick does not complain of his not being included in the realignment. He did not ask to be reassigned. Rather what he complains about is that the surprise realignment was a ruse in Turner's case, and as a consequence he was denied a promotional opportunity for which he was qualified in favor of a black female at the same grade who was arguably less qualified and who had never served in the education assistance branch.

Since the District refused to concede that Turner's reassignment amounted effectively to a promotion (but see p. 645 *supra*), it did not precisely address McCormick's contention that he was equally or better qualified for the post. However, the District did attempt to demonstrate McCormick's poor work performance as justification for what happened to him after Turner became his boss. Much of this evidence was not credible. For instance, several of the defendant's witnesses mentioned the disarray of McCormick's office, testifying that they continually saw files piled on the floor and on the tops of file cabinets.[20] This testimony was undercut by one of defendant's own witnesses, a former subordinate of McCormick who now works under Turner, who stated that she did not recall having difficulty locating material in files when it was needed. There was some credible testimony that one or two of McCormick's employees took excessive sick leave and that one had a personality problem with him. Yet there was no evidence that McCormick was criticized for this, or that his managers were even conscious of it, at the time.

■ A peer of McCormick, Sheila Drews,[21] testified that on occasion Dr. Rumsey had asked her to edit McCormick's writing. This witness was particularly well-spoken and might well be capable of improving upon the prose of most people. Moreover, Rumsey was McCormick's superior well before September 1976, preceding even Dr. Moore, so the relevance of this testimony is slim. More relevant is a letter of recommendation Rumsey wrote for plaintiff on September 2, 1976, just two weeks before Turner demoted him, describing McCormick as "extremely cooperative, efficient, consistent and truly dedicated." The exhibits filed by plaintiff contain many letters and memoranda written by McCormick, and the defendant has made no claim that all or even most of these had been edited. The Court has viewed them, and it concludes that they demonstrate an adequate command of the language. Moreover, as several of the memoranda signed by defendant's higher-ranked employees contain grammatical errors, it is not self-evident that Yeldell or other departmental higher-ups who participated in McCormick's demotion would have noticed or much cared about McCormick's writing style. Consequently, the Court finds that this evidence is pretextual.

The District also stressed the dire straits the Loan Program was in as evidence of McCormick's poor performance. It is true that around 1973 it first became apparent that some students were defaulting, and

---

**20.** At the time, the space allocated to McCormick's unit was quite small.

**21.** This witness, a white, heads the other unit that falls under the Office of Education Affairs.

that thereafter the default rate only grew worse. By 1976, the rate was nearing 30 percent, collection efforts were having only marginal success, and the District was in debt to area banks that had advanced the loan monies. Far from proving that McCormick was to blame for this state of affairs, however, the evidence shows that for years it was McCormick—and apparently only McCormick—who was calling attention to the program's needs and getting little response from his superiors. Defendant produced no memoranda or letters, before Turner's after-the-fact memo, linking McCormick to the program's troubles, nor any showing that he had been reprimanded for poor work. His personnel file contains no evaluations that rank him below satisfactory. In fact, the only document submitted by defendant that pertains to the loan program and is dated before McCormick's demotion is a "Dear Bob" memorandum dated April 14, 1975. It informs McCormick of the results of a review conducted by the District's Program Operations Branch. The review had taken place *over a year earlier,* in February 1974. Coupled with plaintiff's exhibits showing that McCormick made frequent requests of his superiors for assistance, including for accounting help, this is forceful evidence not that his superiors were unhappy with his performance but that too little attention was being paid to both McCormick and the loan program.

On several occasions before his demotion, McCormick urged that the loan program be authorized to take defaulters to court. His pleas went unanswered or were denied. After he was reassigned, however, this reform was implemented. The defendant's attempt to use these as evidence that McCormick did not take proper steps to pursue defaulters is thus disingenuous. The more probable explanation is that

someone in power finally paid attention to the suggestion when it was made by an employee other than McCormick.[22]

It seems that McCormick's superiors did not take a serious interest in the program until the "heat" was on in late 1976 and early 1977, when Congress was investigating the program, there were newspaper stories, and there was talk of its discontinuance. Then, at least for purposes of defending against McCormick's various complaints,[23] they sought to make McCormick the scapegoat for the neglect of others. Turner's predecessor, Ettyce Moore,[24] and her predecessor, William Rumsey, both testified that they had been satisfied with plaintiff's work. Several bankers who had dealings with the District's loan program also testified in plaintiff's favor. After McCormick's transfer, Turner was given an enlarged staff and authority to take court action against defaulters. It was no wonder that collection levels picked up in 1977 and 1978, given the added resources and the attention of her superiors. Even so, problems persisted well into 1977, months after McCormick had left the division.

■■■■ By objective measures, then, the loan program was having problems, but McCormick successfully rebutted the District's contention that he was to blame by showing the inattention of his higher-ups. Moreover, even if McCormick were unqualified for the position given to Turner, he would still be entitled to prevail because he has demonstrated that regardless of his qualifications, it was not doubt as to those qualifications that was the motivating force for the adverse personnel decisions to which he was subjected; it was simple and plain racial discrimination. It is worth noting that 1980 determination of the District of Columbia's own Office of Human Rights found "[p]robable [c]ause to believe that the

**22.** A high student loan default rate was then, and apparently still is, a national phenomenon.

**23.** The case has a lengthy history. Plaintiff filed some administrative complaints as early as the fall of 1976. He then commenced an action in this Court, which was dismissed in 1979 for failure to exhaust all administrative

remedies. McCormick then pursued additional administrative remedies and filed an amended Title VII complaint in December 1980.

**24.** Ettyce Moore also wrote several memoranda to higher-ups seeking help with the Loan Program. It seems that these were disregarded as well.

**648**

respondent has violated the Human Rights Act of 1977 by subjecting the Complainant to disparate treatment in the terms and conditions of his employment because of his race (White)."[25] In short, plaintiff has shown that "these legitimate reasons offered by defendant were not relevant to his case and thus were merely pretextual." *Garner v. Boorstin,* 690 F.2d 1034, 1036 n. 3 (D.C.Cir.1982) (per curiam).

The Human Resources Department could point to no neutral committee that routinely passed on the credentials of employees, as was the case in *Burdine, supra.* Civil service and District government regulations, to the extent that they are a proxy for evenhandedness, were violated time and time again in McCormick's case. If Turner and others genuinely thought McCormick was ill-suited for his job back in 1976, the appropriate options open to them were to work through proper channels to find him a job that would better suit him at the same GS level, or to transfer, to demote, or to remove him through proper procedures. None of these was done.

 When McCormick protested being stripped of his supervisory duties by Turner's fiat, he was summarily transferred out of the field in which he had worked for seven years. Plaintiff was not even informed personally of this obviously unsettling and unexpected news. A court may take account of a Title VII defendant's insensitivity when it is particularly egregious and can be explained on no other ground than prejudice. See, *e.g., Jones v. Trailways Corp.,* 477 F.Supp. 642 (D.D.C. 1979). Plaintiff's was a high visibility job.

It brought him in contact with numerous outsiders, such as bankers and members of educational institutions. The demotion embarrassed him not only in the eyes of the workers he had previously supervised, see *Jones, supra,* but also among these outsiders.

At the time of the reassignment, the transferring official, Bernard Phifer, told a newspaper reporter that McCormick's "new assignment meets a high priority need."[26] Yet it is undisputed that the new assignment was to an essentially nonexistent job in a department whose superiors did not want him,[27] and who gave him no work whatever to do for nearly two years. These are hardly the characteristics of a "high priority" job.[28] Moreover, the transfer of McCormick to a job without a job description was hardly in keeping with Yeldell's April 9 announcement that "all managers— whether or not they will be undertaking new assignments—must be given clearly defined responsibilities and the authority necessary to accomplish these responsibilities." What the District did, rather, was to "suddenly take an employee of . . . demonstrated worth and place him in a position where he [was] of value neither to the agency nor to himself." *Dual v. Griffin,* 446 F.Supp. 791, 799 (D.D.C.1977). As the court said in *Dual,* this "can be explained only as an inconsiderate retaliation for [McCormick's] efforts to seek redress for his complaints of racial discrimination." *Id.*

There is also the fact that there was no legitimate reason why Turner should have tried to further demote McCormick after she was no longer his supervisor. Yet, as

**25.** The Court may consider this report in weighing the evidence. *Weahkee v. Perry,* 587 F.2d 1256 (D.C.Cir.1978).

**26.** This statement is contained in a 1976 *Washington Post* article introduced into evidence by plaintiff.

**27.** In her February 1977 letter complaining about McCormick, Johnson had written:

On several occasions, I have requested assistance from your office in affecting [sic] a proper placement for this employee to no avail. At a minimum it would be helpful if you would tell me what kind of position he is

qualified for. Although, [sic] it was my understanding from previous discussions with the Director that when he decided to remove Mr. McCormick from his position as Chief, Education Assistance Branch, for failure to fulfill his specified duties he also gave your office the assignment of finding an appropriate position for Mr. McCormick.

**28.** If defendant's officers were capable of such disingenuousness when little was at stake other than adverse publicity, they certainly are capable of it when pecuniary interests are on the line.

the Office of Human Rights itself found, she did so for 14 months. This activity can only be described as retaliatory.[29] Finally, when plaintiff attempted to vindicate his rights by filing a complaint with the Human Resources Equal Opportunity Coordinator, no definitive action was taken.

The only explanation for the series of decisions made hastily and in violation of applicable regulations is that the officials making them were motivated by racial animus toward the plaintiff. Because defendant's answers to plaintiff's *prima facie* case consist of evidence that either is not credible or has been shown to be pretextual, the Court holds that the District of Columbia unlawfully discriminated against McCormick because of his race [30] when it blocked a promotional opportunity, demoted him, and reassigned him.

### III

■ The Court has pendent jurisdiction over plaintiff's claim brought under the District of Columbia Human Rights Law, D.C.Code § 1–2501 *et seq.* (1981). Defendant contends that this claim is barred by plaintiff's failure to exhaust his administrative remedies. The point is not well-taken. Plaintiff filed a complaint with the Office of Human Rights that resulted in a finding of probable cause pursuant to § 1–2545. The decision recommended conciliation efforts, but there is no evidence that anything further occurred. The next step would have been for the District to issue a notice of hearing pursuant to § 1–2550—a step it never took. Not receiving this notice, plaintiff was justified in raising the issue directly in this Court. Defendant cannot benefit from its failure to

follow the mandates of its own laws by arguing that it was plaintiff who had the obligation to take the next administrative step.

■ The Human Rights Law permits the award of punitive damages if at least one of several factors is present. 21 D.C. Register No. § 3.11 pp. 1615–16 (Jan. 15, 1975). Here at least three of the five factors obtain: McCormick was demoted, the incident occurred publicly as evidenced by newspaper coverage, and the defendant's acts were "repetitive . . . to the extent that they constituted harassment or caused unusual inconvenience." *Id.* at 31. Accordingly, an award of punitive damages is warranted. See *Abbate v. Hyatt Corp.,* 28 F.E.P. Cases 542 (D.D.C. Feb. 25, 1982).

Plaintiff has also requested a retroactive promotion to Chief, Office of Educational Affairs, the post Turner was given in 1976. Over six years have passed since Turner assumed this post and the Court would not be justified in replacing her with McCormick in view of the disruption such an order would cause. In addition, since Turner and McCormick remained at the same grade until June of this year, a retroactive promotion tied to Turner's employment history would result in monetary gain for McCormick only as of June 1982. This can be effected just as easily by ordering that McCormick be promoted to GS–14 retroactive to the date on which Turner's promotion took effect.

---

29. McCormick filed his first accusation of race discrimination in November 1976. Plaintiff did not emphasize the retaliatory aspects of his proof at trial but retaliatory acts permeate the case.

30. Because the Court finds that plaintiff was the victim of race discrimination it does not need to make a specific finding on the question of gender discrimination. Plaintiff testified that Yeldell had a policy of favoring black women over other employees. Indeed, many of the people included in the realignment were

black women, and plaintiff worked for several black women. Nevertheless, men also took part in the decisions that affected him adversely, namely Yeldell and Phifer, while only one white had any role, and this was a minor one: Albert Russo, the person who succeeded Yeldell as Director of the Human Resources Department, worked with Johnson and Perry in arranging for McCormick's reassignment to Security Officer, according to the 1980 decision issued by the Office of Human Rights.