Joycelyn A. THOMPSON, Plaintiff,

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, et al., Defendants.**

Civ. A. No. 83–1845.

United States District Court, District of Columbia.

July 31, 1985.

Stephen J. Boardman, John R. Dwyer, Jr., Washington, D.C., for plaintiff.

Clinton J. Miller, III, Joseph Guerrieri, Jr., Highsaw & Mahoney, P.C., Washington, D.C., for defendants; Joseph P. Manners, General Counsel, IAM, Washington, D.C., of counsel.

## MEMORANDUM OPINION
## AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Joycelyn A. Thompson brings this action against the International Association of Machinists and Aerospace Workers ("IAM") and four officials of that union to redress alleged employment discrimination and retaliation. Plaintiff, a black woman, claims that she was discharged from her job as Assistant Director of the IAM Human Rights Department on account of her race and sex and that defendants retaliated against her for engaging in certain advocacy activities protected by statute. In her amended complaint,[1] plaintiff sets forth claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (race, sex and retaliatory discrimination), Section 1 of the Civil Rights Act of 1966, 42 U.S.C. § 1981 ("§ 1981") (race discrimination only), the Ku Klux Klan Act, 42 U.S.C. § 1985(3) ("§ 1985(3)") (conspiracy to deprive plaintiff of her right to be free from race, sex or

---

1. Plaintiff's allegations of retaliation were added to the original complaint by amendment. *See* December 2, 1983 Order and Amended Complaint filed same date.

retaliatory discrimination) and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 1–2501, *et seq.* (race, sex and retaliatory discrimination). The Title VII claim was subsequently dismissed as against three of the four individual defendants, *Thompson v. IAM*, 580 F.Supp. 662, 668–69 (D.D.C.1984),[2] and the matter proceeded to trial.

Over a five-day period the case was tried simultaneously to this judge (the factfinder on the Title VII claim) and to a jury (the trier of fact on the remaining claims). At the close of the evidence, the Court reserved decision on the Title VII action but entered judgment on the jury verdict denying the § 1981 claim, but finding for plaintiff on the § 1985(3) and DCHRA claims. The jury assessed compensatory damages against defendants in the amount of $2,000 and punitive damages in the amount of $200,000. Defendants promptly filed a motion for judgment notwithstanding the verdict ("n.o.v.") or, in the alternative, for a new trial. That motion and supporting papers, plaintiff's opposition thereto and defendants' reply, as well as the entirety of the Title VII cause of action, are now before the Court.

Several of defendants' arguments in support of their motion for judgment n.o.v. or, alternatively, for a new trial address the sufficiency or weight of the evidence on the basis of (1) the instructions given, (2) the verdict as to liability, and (3) the jury's award of damages. In recognition of the overlap between the issues raised by defendants' alternative motion and the Title VII claim—both of which are matters for the Court's consideration—the evidence will be reviewed for both purposes below.

## I. *Summary of the Evidence*

Plaintiff's discrimination and retaliation claims—however styled—turn on defendants' motive in discharging plaintiff from the assistant directorship of the IAM Human Rights Department on June 29, 1982.

Defendants contend that plaintiff was fired because she displayed an unwillingness or inability to cooperate with her supervisor and with the goals of the human rights department generally. The theme of plaintiff's case is that she consistently "did a good job" for the IAM and that the proffered reasons for her termination are pretextual. Through the testimony of the parties, nonparty past and present IAM members, and numerous associates and acquaintances of plaintiff, considerable evidence in support of both theories was presented at trial.

Plaintiff is a black woman born in 1941. A native of Guyana and self-described "product of the free trade union movement" in that country, she first came to the United States in 1962 on a student visa. After attending classes at the Cortez-Peters Business School from 1962, she enrolled at Howard University and received a bachelor's degree in economics from that institution in 1969. Plaintiff's undergraduate studies were principally directed to the labor movement in the Caribbean and South America, and she subsequently undertook post-graduate coursework with a concentration on labor union topics, as preparation for employment with a labor organization.

In November, 1970 plaintiff was hired as a research associate (her first professional job) at the IAM International Headquarters in Washington, D.C. The IAM is a labor organization representing some 750,000 members. It is governed by its international convention, which meets every four years. Resolutions passed by the convention are implemented by the executive council composed of a president, a general secretary-treasurer, and nine vice presidents, some of whom are general vice presidents and some of whom cover geographical regions. The union's international headquarters is organized into various departments, including departments for research, education, human rights, communi-

---

**2.** Other aspects of the February 13, 1984 Order reported at 580 F.Supp. 662 are discussed *infra* at Parts II–A and II–C.

ty services and international affairs. Each department is headed by a director. Tr. 8–9. The four individual defendants to this action work for the IAM at its headquarters: William Winpisinger is currently the international president of the union, George Poulin and George Kourpias are both general vice presidents and Clark Johnson directs the human rights department.

Plaintiff testified that her initial duties in the research department at IAM headquarters were to classify labor agreements negotiated by staff personnel in the field and to provide information to the field staff for their use in negotiations. Tr. 34. In 1973, plaintiff approached then-IAM president defendant Winpisinger to volunteer her services as a liaison between the IAM and various women's and civil rights organizations. According to Winpisinger, he enthusiastically supported her proposal, authorized her to take on the liaison role, and began channeling correspondence relating to women's issues to plaintiff. One of the numerous organizations in which plaintiff participated on behalf of the IAM was the Coalition of Labor Union Women ("CLUW"). Defendant Winpisinger testified that shortly after plaintiff began her liaison duties with CLUW, a handful of that organization's members protested to him that plaintiff lacked the hands-on shop floor experience that would best befit an IAM contact person in CLUW. Winpisinger responded that plaintiff should be given an opportunity to demonstrate her skills in the role, and (according to his testimony), the complaints "dried up immediately." Tr. 838. Several witnesses testified that, in general, plaintiff's contacts as an IAM spokeswoman with outside organizations benefited the union.

In 1976, the IAM created a civil rights department at its international headquarters and in 1977, defendant Clark Johnson was appointed by then-IAM International President Winpisinger to head that department. Tr. 42, 838. A few months later, plaintiff expressed to Johnson her interest in obtaining a position in the civil rights department, and she subsequently formally applied for a position there. Although there may have been some discussion of appointing a white woman or Hispanic to assist Johnson, defendant George Poulin called plaintiff in December 1977 to notify her that she would be named by Winpisinger to be the civil rights department's assistant coordinator commencing January 1978. Tr. 43, 106–07. Plaintiff stated at trial that her primary duty in that position was to provide support to Johnson, assisting him in his efforts to eliminate workplace discrimination and performing other tasks as assigned. She divided her specific duties into three categories: (1) preparing instructional and educational material for use at conferences and workshops, (2) attending conferences and conducting seminars, and (3) continuing her liaison function with outside organizations. By plaintiff's estimate, between 50 and 70% of her time was devoted to women's issues Tr. 43, 110. There is no dispute that, at least at the outset, her work was well-received and she received no oral or written warnings that her performance was deficient in any way.

Defendants contend that plaintiff's discharge in 1982 resulted from the thematic direction of her public appearances on behalf of the union and a deterioration in her relationship with her supervisors. At trial, much of the testimony presented focused on certain incidents which, defendants claim, form the foundation for that defense. One such incident (the basic facts of which are not disputed) occurred at the 1979 IAM Indiana State Council meeting held in Indianapolis and sponsored by the political arm of the IAM in that state. Plaintiff spoke before a group at that meeting on the topic of women in the economy. Her remarks grew praise from the audience; however, some of the women in the group noticed with disapproval that immediately before the speech, the regional vice president and leadership of the state organization had left the room. The chairman of the session returned to hear plaintiff; the others did not. As plaintiff was leaving the conference area on an elevator, the

women asked why the officials—who they felt should have attended plaintiff's presentation—had left. Plaintiff responded that she did not know. When the regional vice president entered the elevator, plaintiff exited and suggested that the women direct their question to him. Some four months later, at defendant Poulin's request, plaintiff memorialized the incident in a handwritten memorandum. DX F. In that memorandum, she acknowledged that not all of the IAM regional vice presidents welcomed her into their territories and explained that for that very reason she had been careful to act in a diplomatic fashion when members of her audience confronted the regional vice president in the elevator.

Another incident involving plaintiff occurred at the IAM general convention held in Cincinnati, Ohio in September 1980. Following a large caucus of female IAM members at the convention, arrangements were made for a subset of that group to meet to draft a resolution for the advancement of women in the union. At a daily staff meeting, plaintiff reported to her superiors that the meeting would take place, and defendant Poulin advised her that as director of the human rights department (formerly named the civil rights department), defendant Johnson would accompany her to the meeting. Defendant testified that she was concerned and upset by that decision because it "sent two signals" to the women—that plaintiff was not trusted by her superiors or, alternatively, that she was not doing her job. Tr. 127. Plaintiff did not accompany Johnson to the meeting but instead arrived ahead of him. According to Johnson, his presence was not welcomed, but the meeting proceeded without incident. The following day, Johnson observed plaintiff crying at various times throughout the day at the civil rights information booth where she was stationed. Plaintiff testified that she was crying because she was upset that Johnson had been dispatched to the meeting of the women's group. The booth was visible to many people, and several gathered around to provide sympathy and comfort to plaintiff during the day. Defendants viewed the spectacle as an em-

barrassment to the union administration generally and to Johnson in particular, and plaintiff was reprimanded for her conduct upon her return to headquarters. Tr. 705–06.

Yet another incident which was the subject of testimony occurred at the IAM training conference held at Placid Harbor, Maryland, in August 1981. The conference, as described by defendant Winpisinger, was the occasion for the unveiling of a training curriculum designed to equip the union's organizers to confront antiunion tactics in the field and to capture the allegiance of unorganized workers. Tr. 848. Each department was charged with preparing a presentation which would "homogenize [the department's program and goals] into an aggressive forward thrust." Tr. 848. So that the union's top leaders would know the substance of and vital need for the curriculum and would be able to critique and adjust it as necessary, defendant Winpisinger directed that the IAM executive council would be the first class to which the new program would be presented. Tr. 848–50.

Plaintiff and defendant Johnson each delivered part of the presentation of the human rights department, plaintiff following Johnson to the podium. Winpisinger testified that some members of the audience, including himself, perceived tension and disagreement between the two, based in part on plaintiff's facial expressions and an apparent contrast in their themes. According to Winpisinger, Johnson's presentation was constructive and responsive to the assignment given, but plaintiff dwelled on the existing imbalance of minority representation in the union's top positions, rather than on the grassroots incentive programs which were the department's focus. Tr. 851. Winpisinger further testified that his reaction to the perceived infighting before the executive council was one of "unadulterated outrage" and that the council members in the audience were incensed as well. Tr. 846, 852.

Defendants testified that following the Placid Harbor training conference, Winpi-

singer decided to assign defendant Kourpias to exercise tight supervision over the human rights department in an effort to unify the spirit of the department. Over the next several months, Kourpias reported back on his progress and setbacks, and finally in the spring of 1982 announced that the department as it stood could not be saved. Winpisinger determined that plaintiff should be discharged at the end of June 1982, and instructed Poulin to carry out that decision. Poulin called plaintiff into his office on June 29, 1982 and informed her that her employment had been terminated, effective immediately. Poulin testified that he declined to discuss at length the reasons for the termination, but did explain to plaintiff that, in the union's estimation, the goals of the human rights department could not be met with her in the department. Tr. 573. Plaintiff claims that she was given no specific reasons for the termination; however, she does acknowledge being told that the discharge resulted from an evaluation of her performance.[3] Tr. 74. Plaintiff was offered a letter of recommendation and received her full salary through July 1982, in addition to compensation for accrued vacation time.

The occurrence and sequence of events in the above chronology is essentially undisputed: it is the *significance* of the various incidents that is the subject of controversy. Defendants argue that plaintiff's conduct at the 1979 Indiana council meeting, the 1980 convention and the 1981 Placid Harbor training seminar was indicative of her attitude generally. Each defendant testified that plaintiff did not work well with her supervisor, Clark Johnson, and refused to submit to his leadership in the human rights department. The defendants stated that over time, they came to realize that plaintiff sought control over that part of the department's program related to women's issues and resisted Johnson's participation in those matters. Defendants Winpisinger, Poulin and Kourpias further testified that plaintiff publicly belittled and un-

dercut Johnson, whom she considered her intellectual inferior. Moreover, they testified that plaintiff appeared to have her own agenda for improving the union's racial balance, and used her position to advance her ideas (which called for an increase in appointments of blacks and women to high-level positions) over the union's program of grassroots development of minority opportunities in the field.

To corroborate plaintiff's claim that the asserted basis for her discharge was pretextual, a number of plaintiff's professional associates testified that they had never heard plaintiff belittle the union, its program, or her superiors and that she was, to their knowledge, at all times an excellent spokeswoman for the IAM. Plaintiff admitted that she and Clark Johnson "had [their] differences", Tr. 113; DX Q, but she denied that any frustrations she may have felt affected her ability to serve as Johnson's subordinate. Charles Higgins, a white male who had served as assistant to the white male director of the IAM education department until December 1982, testified that both he and a white woman in another department clashed with their superiors without being discharged. In later testimony, defendant Winpisinger stated that the white woman to whom Higgins referred had not held a position analogous to plaintiff's: according to Winpisinger, that employee was hired as a trade specialist but was delegated to assist a department director based on her expertise in trade. Winpisinger unequivocally stated that she was not the director's assistant and when the two were unable to work together she simply resumed her original duties outside of that department. Tr. 864–65.

In her own testimony, plaintiff emphasized that throughout her tenure at the IAM she received no written warnings of poor performance or advance notice of her termination. She further testified that even her direct supervisor claimed no fore-

---

**3.** Plaintiff's testimony that Poulin claimed to be seeking a replacement for her was directly re- futed by Poulin. Tr. 574.

knowledge of her termination and denied complaining about her work. Tr. 80. Defendant Winpisinger's testimony corroborated plaintiff on that point: by his account, he personally decided to fire plaintiff based in part on the feedback he had received from Kourpias since Kourpias had been assigned supervision of the human rights department. Winpisinger testified that he intentionally did not seek Johnson's direct participation in the discharge decision, because he was unwilling to pit one black against another. Tr. 899. Johnson testified that he had suggested to Kourpias that plaintiff be discharged from the department, Tr. 714, but there is no evidence that he discussed the matter directly with Winpisinger. Consistent with that, Winpisinger stated that he learned of Johnson's recommendation to Kourpias only after plaintiff had actually been discharged. Tr. 911.

Plaintiff also submitted that during defendant Winpisinger's term as international president of the union, only a small number of the available appointed positions in the union were awarded to minorities. At trial, Winpisinger disclaimed responsibility for the appointments made by vice presidents outside of headquarters, and contended that at least half of the appointees he himself selected were women and two were blacks. Tr. 912.

Finally, considerable testimony was presented with regard to defendant Winpisinger's general attitude on discrimination issues. To an individual, plaintiff's witnesses, including plaintiff herself, concurred in defendants' portrayal of Winpisinger as a leading opponent of discrimination in the labor field. No one disputed that the IAM civil rights (later human rights) department was the brainchild of Winpisinger and that he cared deeply about its success. It was also agreed that Winpisinger actively participates in or supports numerous organizations (including CLUW) which are dedicated to fighting discrimination in the workplace and elsewhere. By themselves, such factors bear on but do not decide the issue presented to the jury and to the Court—whether defendants' treatment of plaintiff was motivated by discriminatory animus.

When faced with that question, and after weighing all of the evidence presented and assessing the demeanor and credibility of those who testified, the jury concluded that plaintiff had failed to prove her claim under 42 U.S.C. § 1981, but had prevailed under 42 U.S.C. § 1985 and the DCHRA. Defendants' various challenges to that verdict will be considered in the following section.

## II. Consideration of Defendants' Motion

### A. Legal Standards and Defendants' Arguments Under Federal Rules of Civil Procedure 50(b) and 59

Under Federal Rule of Civil Procedure 50(b), a motion for judgment n.o.v. is resolved under the same standard as that applied to a motion for a directed verdict. *Vander Zee v. Karabatsos*, 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979); *see also Tavoulareas v. Piro*, 759 F.2d 90, 105 (D.C.Cir.1985), vacated on other grounds and set for rehearing en banc. The accepted formulation of that standard in this Circuit is found in *Alden v. Providence Hospital*, 382 F.2d 163, 165 (D.C. Cir.1967):

> Unless the evidence, along with all inferences reasonably to be drawn therefrom, when viewed in the light most favorable to the plaintiff is such that reasonable jurors in fair and impartial exercise of their judgment could not reasonably disagree in finding for the defendant, the motion must be denied.

*Tavoulareas*, 759 F.2d at 105; *accord Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir.1984); *Coburn v. Pan American World Airways*, 711 F.2d 339, 342 (D.C.Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922, 924–25 (D.C.Cir.1982). The motion may be granted only when, *"without weighing the cred-*

*ibility of the evidence*, there can be but one reasonable conclusion as to the proper judgment", 5A J. Moore, *Moore's Federal Practice* ¶ 50.07[2] (2d ed. 1984) (emphasis supplied). If fair-minded people may differ as to the conclusion, or if there is substantial conflicting evidence, the judgment n.o.v. motion must be denied. *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d at 1227; *see also Coburn v. Pan American World Airways, Inc.*, 711 F.2d at 342.

■ A motion for new trial pursuant to Federal Rule of Civil Procedure 59 is addressed to the trial court's discretion

> insofar as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving ...

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). "Other reasons" supporting a Rule 59 motion may include substantial errors in admission or rejection of evidence or jury instructions, jury misconduct, inconsistency in the verdict, denial of the proper mode of trial, or belated discovery of evidence, to name a few. *Id.;* 6A J. Moore, *Moore's Federal Practice* § 59.08 (2d ed. 1984).

■ As one basis for both alternatives requested in their motions for judgment n.o.v. or a new trial, defendants contend that plaintiff should not have been granted a jury trial under the DCHRA as a matter of law. As the parties are well aware, there is a split of opinion in the district courts of this Circuit as to whether DCHRA claims call for a jury trial. *See Turgeon v. Howard University*, 571 F.Supp. 679 (D.D.C.1983) (motion to strike demand for jury trial under DCHRA denied); *see also Abbate v. Hyatt Corp.*, 28 F.E.P. Cases 542 (D.D.C.1982) (DCHRA claim tried to judge). This Court has chosen to follow the *Turgeon* case inasmuch as the DCHRA claim, like the § 1981 claims, seeks compensatory damages, a form of legal relief. *See generally Goodman v. Washington Radio, Inc.*, Civil Ac-

tion No. 81–0062 (D.D.C. April 26, 1982) (attached to plaintiff's opposition to defendants' motion) and cases cited therein. Accordingly, that claim was properly tried to the jury rather than to the Court.

■ Defendants next challenge that portion of the verdict finding for plaintiff on her § 1985(3) claim on the ground that the evidence was legally insufficient to support that finding. Defendants correctly state that absent a finding for plaintiff on the § 1981 race discrimination claim, the § 1985(3) finding must be overturned. As was explained in the Order of February 13, 1984 at 9–11,

> § 1985 provides no substantive rights to plaintiff; it merely provides a remedy for violation of the rights it designates. *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 372 [99 S.Ct. 2345, 2349, 60 L.Ed.2d 957] (1979). The Supreme Court has expressly removed the guarantees of Title VII from the category of 'designated rights' subject to redress under § 1985(3) ... [Moreover, the Supreme Court in *Novotny* ] described § 1985(3) as a remedial statute 'providing a civil cause of action when some otherwise defined *federal* right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy.' *Novotny* at 376 [99 S.Ct. at 2351] (emphasis supplied).

580 F.Supp. at 667. Although the Court denied defendants' previous motion to dismiss the § 1985(3) claim in its entirety, it did so only because the § 1981 claim in plaintiff's amended complaint provided the necessary *potentially-successful* substantive federal cause of action. *Id.* at 668. When the jury rejected that claim, it effectively rejected the conspiracy claim as well: because the evidence, as viewed by the jury, did not support a finding of race discrimination, it necessarily was legally insufficient to support a finding that defendants had conspired to discriminate on the basis of race.[4] Accordingly, that por-

---

**4.** Plaintiff acknowledges that "her Section 1981

right to be free from race discrimination was

tion of defendants' judgment n.o.v. motion which addresses the verdict on the § 1985(3) claim is granted. There is, therefore, no need to reach defendants' contention that the § 1985(3) instruction should not have been given in light of the evidence adduced, and that a new trial is warranted on that basis.

■ As part of their motion for new trial, defendants challenge the decision made at trial to exclude the testimony of three witnesses who would testify on defendants' behalf. This argument requires little discussion. In mid-trial, counsel for both parties debated at the bench whether the witnesses at issue should be allowed to testify, in that they had been listed as potential witnesses on defendants' pretrial submissions, but had not (and should have) been previously identified to plaintiff in response to a certain interrogatory posed during discovery. It was decided that defendants could elicit the testimony of the desired witnesses only as part of a surre-buttal, if rebuttal were presented, but not in response to plaintiff's case in chief. Tr. 651–52. Plaintiff's tactical decision to forego rebuttal in effect precluded the testimony of the contested witnesses. That outcome does not demonstrate trial court error; on the contrary, it illustrates one consequence of a failure to timely identify potential witnesses.

Each of defendants' remaining contentions turns on the evidentiary support for decisions made by the jury or court. Specifically, defendants assert as bases for their motion for judgment n.o.v.:

> that the evidence presented was legally insufficient to support the jury verdict on the DCHRA claim, and a reasonable and fairminded jury could not find against defendants on that claim;

> that the evidence presented was legally insufficient to support the jury finding on punitive damages;

the right at which the [alleged] conspiracy was aimed." Plaintiff's January 17, 1985 Opposition

> that the award of punitive damages was excessive in light of the evidence presented and applicable law.

In support of their motion for new trial, defendants contend:

> that the verdict under the DCHRA is against the weight of the evidence;

> that the punitive damage instruction should not have been given in light of the evidence produced;

> that the damages awarded were unwarranted and excessive in light of the evidence, among other things.

Defendants' Motion for Judgment N.O.V. or New Trial at 2–3. These arguments are addressed in the two following sections.

### B. *Liability Decision under DCHRA*

■ In her complaint, plaintiff states a claim under the DCHRA alleging discrimination based on race and sex and retaliatory discrimination. The legal standards applicable to race discrimination claims under the DCHRA and § 1981 are identical, *see e.g., Carter v. Duncan-Huggins, Ltd.,* 727 F.2d at 1231; *Hawkins v. Jonathan Woodner Co.,* 31 F.E.P. Cases 1288, 1292 (D.D.C.1982), as were the instructions given at trial under those two statutes on the race discrimination issue. Therefore, because the jury found against plaintiff on the § 1981 claim, the DCHRA verdict for plaintiff must rest on a finding of sex discrimination and/or retaliation rather than race discrimination.

■ The legal analysis of a DCHRA disparate treatment claim follows the pattern established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII case. *See Hawkins v. Jonathan Woodner Co.,* 31 F.E.P. Cases at 1292; *see also McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir. 1984) (*McDonnell Douglas* order of proof applicable to claims of retaliatory discrimination). The plaintiff must carry an initial burden of establishing a prima facie case of discrimination. In a sex discrimination

Memorandum at 44.

case, this burden is met by plaintiff's demonstration that she (1) belongs to a protected group, (2) was qualified for the position, (3) was terminated, and (4) that others not in the protected class were treated differently. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Coburn v. Pan American Airways*, 711 F.2d at 342 (age discrimination analysis analogous to Title VII). A prima facie case of retaliatory discrimination requires a showing (1) that the plaintiff was engaged in the statutorily protected activity, (2) that the employer took an adverse personnel action, and (3) that a causal connection existed between the two. *McKenna v. Weinberger*, 729 F.2d at 790 and cases cited at n. 50 therein; *Evans v. Mail Handlers*, 32 F.E.P. Cases 634, 639 (D.D.C.1983); *Reese v. Batesville Casket Co.*, 25 F.E.P. Cases 1472, 1476 (D.D.C.1981). Neither formula requires direct proof of discrimination at the first stage; plaintiff need only establish facts adequate to permit an inference of discriminatory or retaliatory motive. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McKenna v. Weinberger*, 729 F.2d at 790.

█ Once the plaintiff has established a prima facie case, the burden of production shifts to the defendants to articulate a legitimate, non-discriminatory reason for plaintiff's discharge. *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). If defendants carry that intermediate burden the prima facie case is rebutted and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the articulated reason was pretextual. *McDonnell Douglas v. Green*, 411 U.S. at 802–05, 93 S.Ct. at 1824–25. The burden of demonstrating pretext merges with the ultimate burden of proving intentional discrimination or retaliation, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95, and in the final analysis the factfinder must decide whether defendants intentionally discriminated or retaliated against the plaintiff. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482.

█ The jury in this case had before it ample evidence to establish a prima facie case of both sex discrimination and retaliatory discrimination. There is no dispute that plaintiff is female, that she was discharged from her job, and that she was an active spokeswoman on behalf of minorities and women within the union. In addition, plaintiff introduced evidence that she was qualified for the position she held, that at least one male assistant director at IAM Headquarters was not discharged for conduct arguably similar to hers, and that her style of advocacy may have been tied into defendants' decision to discharge her. Defendants rebutted the inferences raised by plaintiff, and the ultimate factual issue— the question of motive—was squarely placed before the jury.

Presented with all of the evidence, and given the opportunity to judge the demeanor and credibility of the witnesses, a fair-minded jury could have decided either for or against plaintiff. The jury chose the former, finding either sex discrimination or retaliation or both. Perhaps the jurors concluded that plaintiff's conduct in the incidents highlighted at trial was inoffensive and a pretextual basis for plaintiff's dismissal. Even accepting that the incidents took place as described by defendants, the jurors may have concluded that defendants would have tolerated plaintiff's conduct had she been a man dealing with fellow male superiors. They may have believed that plaintiff's discharge was an act of retaliation prompted by the substance of her antidiscrimination advocacy rather than by the tactics by which she conveyed it. Each of these is a feasible outcome: a verdict in favor of defendants is not the only "reasonable conclusion" that the jurors could have drawn, and accordingly their verdict on the DCHRA liability issue must withstand defendants' motion for judgment n.o.v. *See Coburn v. Pan American World Airways, Inc.*, 711 F.2d at 342, and

cases cited therein; *see also Tavoulareas v. Piro,* 759 F.2d at 105 n. 14 ("a judgment n.o.v. is particularly inappropriate where the case depends on witness credibility").

 Defendants' challenge to the jury's liability decision on their motion for new trial will likewise be denied. Out of respect for the function of the jury as the trier of fact, an allegation on a motion for new trial that the verdict is against the weight of the evidence will generally be rejected "unless it is quite clear that the jury has reached a seriously erroneous result", Wright, *Law of Federal Courts* (4th ed. 1983) at 634, and the district judge finds the verdict contrary to the "great weight" or "clear weight" of the evidence. *See Jackson v. Magnolia Brokerage Co.,* 742 F.2d 1305 (11th Cir.1984); *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184 (9th Cir.1984) *cert. denied,* — U.S. ——, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *Litman v. Massachusetts Mut. Life Ins. Co.,* 739 F.2d 1549 (11th Cir.1984); *Perricone v. Kansas City So. Ry. Co.,* 704 F.2d 1376 (11th Cir.1983); *but see* 6A J. Moore, Moore's Federal Practice § 59.00[5] (trial court may set aside verdict as contrary to the preponderance of the evidence).[5] In this case, the jurors' task of ascertaining defendants' motive turned in large part on their perceptions of witness credibility. The clear weight of the evidence demonstrated that defendant Winpisinger had a history of condemning discrimination, but the evidence concerning defendants' specific treatment of plaintiff was hardly one-sided. Under these circumstances, even though the Court may have weighed the evidence differently, see part III *infra,* it cannot be said "with definitive and firm conviction that a mistake has been made." *See* Wright, *Law of Federal Courts, supra* at 635. Accordingly, the DCHRA liability issue shall not be retried.

### C. *Damages Available Under DCHRA*

As grounds for judgment n.o.v. or a new trial, defendants challenge (1) the fact that the jury was instructed on punitive damages, (2) the sufficiency of the evidence to support the damage award, and (3) the amount of damages given ($2,000 compensatory and $200,000 punitive). Because defendants' motion for judgment n.o.v. was granted as to the § 1985(3) claim, the issue before the Court is whether plaintiff's success on her DCHRA claim will support all or part of the damage award.

 The damage instructions read to the jury covered three topics—compensatory damages generally (Tr. 1048–50), damages in excess of $400 per defendant under the DCHRA (Tr. 1050–51), and punitive damages (Tr. 1051–52). Consistent with the language of the DCHRA, *see Eller v. Houston's Restaurant,* 35 F.E.P. Cases 1801, 1802 (D.D.C.1984),[6] it is this

---

5. In this Circuit, a district court's denial of a motion for new trial on this basis will withstand review unless "there was a total absence of evidence to support the jury's verdict." *Columbia Plaza Corp. v. Security National Bank,* 676 F.2d 780, 788 (D.C.Cir.1982). This appellate test for abuse of discretion should not be confused with the standard applied at the trial level.

6. Section 3.11 of the guidelines for payment of damages under the DCHRA ("Guidelines") promulgated by the Commission on Human Rights of the District of Columbia ("Commission") authorizes payment of "damages in excess of $400 for embarrassment, humiliation and indignity." Under this provision,

" 'such damages shall be prove[n] by competent evidence' and the Court shall '[take] into consideration' ... [w]hether the act or acts of discrimination were accompanied by one or more of the following:

(1) Untrue derogatory statements by the respondent regarding the awardee or made known to the awardee.

(2) Awardee was demoted or terminated.

(3) Racial, ethnic, religious, sexual or other epithets were used.

(4) The incident, if any, occurred publicly or was within the knowledge of awardee's friends, acquaintances, peers or family.

(5) the respondent's unlawful acts were willful and/or repetitive and/or reckless to the extent that they constituted harassment or caused unusual inconvenience."

21 D.C. Register No. 14 § 3.11 pp. 1614–15 (1975), approved pursuant to D.C.Code § 1–2553.

In the *Eller* case, this Court struck plaintiff's demand for punitive damages under the DCHRA as follows:

"Although both *McCormick* [*v. District of Columbia,* 554 F.Supp. 640, 649 (D.D.C.1982) ] and *Abbate* [*v. Hyatt,* 28 F.E.P. Cases 542, 544 D.D.C.

Court's view that the second category is a specialized form of compensatory damages, and nothing in the Court's instructions on prior orders contemplated that the punitive damage instruction would apply to plaintiff's claim under the DCHRA. *See* Tr. 1051 (summing up DCHRA instruction in terms of "compensatory damages"); *see also* Order of February 13, 1984, 580 F.Supp. at 669–70 (denying motion to dismiss for punitive damages under §§ 1981 and 1985(3) without addressing availability of punitive damages under DCHRA). Accordingly, there being no basis for the $200,000 punitive damage award under the DCHRA, that portion of the damage award must be stricken from the judgment. Ample evidence was presented to support the $2,000 compensatory damage award, and that shall stand.

### III. *Title VII Claim*

■ Remaining for resolution is plaintiff's Title VII claim. The framework for analysis of the Title VII issue has already been set forth (see *supra*) and the legal issue presented—whether defendants intentionally discriminated and/or retaliated against plaintiff—is identical to that placed before the jury. With all due respect to the jury and its collective wisdom, the Court's weighing of the evidence and assessment of witness credibility produces a judgment in favor of defendants. Even accepting that plaintiff has produced a prima facie case, she has failed to persuade the Court, by a preponderance of the evidence, that defendants acted with an unlawful motive. It is the Court's opinion that defendants credibly testified that their decision to fire plaintiff had nothing to do with her sex or the fact that she advocated minority rights—it was the tension between plaintiff and her supervisor that defendants found intolerable. As Johnson's

subordinate, plaintiff was the most likely candidate for dismissal if the department's program should suffer as a result of differences between plaintiff and Johnson. Had plaintiff been a male conducting himself exactly as plaintiff did, this Court believes that defendants would have taken the same action in the interest of the department's future. Likewise, plaintiff has not proven to the Court that the subject matter of her advocacy activities was the causal element resulting in her discharge. Plaintiff's advocacy of even the most benign cause, carried out through the divisive conduct credibly testified to at trial, would have brought the same result. In other words, plaintiff's methods, not her message, were her downfall. *See e.g., Hamm v. Board of Regents*, 708 F.2d 647 (11th Cir.1983) (on similar facts, plaintiff failed to demonstrate Title VII violation). Accordingly, defendants' discharge of plaintiff did not violate Title VII, and judgment shall be entered for defendants on the Title VII claim.

In accordance with the above, it is by the Court this 31st day of July, 1985

ORDERED that defendants' motion for new trial is hereby denied. It is further

ORDERED that defendants' motion for judgment n.o.v. on plaintiff's claim under 42 U.S.C. § 1985(3) is hereby granted, and it is further

ORDERED that defendants' motion for judgment n.o.v. on plaintiff's claim under the District of Columbia Human Rights Act, D.C.Code § 1–2501 *et seq.* is hereby denied except to the extent that the jury verdict of punitive damages is stricken. It is further

ORDERED that judgment shall be entered in favor of defendants on plaintiff's claim under Title VII, 42 U.S.C. § 2000e *et seq.*

1982) ] refer to Section 3.11 damages as 'punitive' the Guidelines themselves list Section 3.11 damages as one of several categories of 'compensatory damage', and generally provide for awards of damages to compensate for injuries sustained as a result of discriminatory acts and practices" (Guidelines, Section 2.3), as well as awards of attorney's fees (Guidelines, Section

1.0). In keeping with the stated intent of the Commission, plaintiff's claim for punitive damages under Counts I and II shall be considered to be a claim for compensatory damages for embarrassment, humiliation and indignity in excess of $400 and shall be allowed to stand." *Eller v. Houston's Restaurant,* 35 F.E.P. Cases at 1802.